1

**ARMENTA & SOL, PC**
M. Cris Armenta (SBN 177403)
2 Credence E. Sol (SBN 219784)
11440 West Bernardo Court, Suite 300
3 San Diego, CA 92127
Telephone: (858) 753-1724
4 Facsimile: (310) 695-2560
cris@crisarmenta.com
5 credence@crisarmenta.com

6 Attorneys for Plaintiff MARSHALL DANIELS
aka Young Pharaoh
7

8      **UNITED STATES DISTRICT COURT**

9     **FOR THE NORTHERN DISTRICT OF CALIFORNIA**

10 MARSHALL DANIELS, also known as  Case No.
Young Pharaoh, an individual,
11           **COMPLAINT FOR:**
      Plaintiff,
12
  vs.        **1. VIOLATION OF THE FREE**
13 ALPHABET, INC., a Delaware   **SPEECH CLAUSE OF THE**
corporation; GOOGLE, LLC., a   **FIRST AMENDMENT OF THE**
14 Delaware limited liability company;  **UNITED STATES**
YOUTUBE LLC, a Delaware limited  **CONSTITUTION;**
15 liability company; DOES 1 through 10, **2. BREACH OF THE COVENANT**
inclusive.        **OF GOOD FAITH AND FAIR**
16           **DEALING;**
           **3. CONVERSION;**
17     Defendants.  **4. UNJUST ENRICHMENT;**
           **5. BREACH OF CONTRACT;**
18          **6. MONEY HAD AND RECEIVED;**
           **7. VIOLATION OF SECTION**
19           **17200 OF THE CALIFORNIA**
           **BUSINESS AND PROFESSIONS**
20           **CODE;**
          **8. FRAUD IN THE INDUCEMENT;**
21          **9. WIRE FRAUD**

22          **[Demand for Jury Trial]**
          **[Injunctive Relief Requested[**
23

24

25

26

27

28

          1

Plaintiff Marshall Daniels, an influential social media commentator also known as "Young Pharaoh" ("Daniels" or "Young Pharaoh"), by and through his counsel, on personal knowledge as to his own actions and information and belief as to the actions, capabilities and motivation of others, hereby alleges as follows:

## NATURE OF CASE

1.      This is a civil rights action brought against social media giants that, at the behest of and in cooperation with influential and powerful members of Congress, have violated Plaintiff's fundamental constitutional rights.  Although this action is brought in the Plaintiff's individual capacity, it seeks to vindicate important free speech rights that protect all Americans.

2.      This action, which is brought under the First and Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1983, challenges Defendants' restriction on Plaintiff's right to free speech.  In response to encouragement, coercion and threats by powerful government actors, Defendants have banned, limited and taken down Plaintiff's speech and prohibited Plaintiff from monetizing his YouTube channel, at least with respect to political messages with which certain members of Congress disagree.  In addition to removing Plaintiff's content from the YouTube platform, Defendants have stolen monies that were donated directly to Plaintiff on his YouTube channel by his fans and followers, giving rise to claims for conversion, breach of contract, breach of the covenant of good faith and fair dealing, unjust enrichment, money had and received, fraud in the inducement, wire fraud, and violations of California Business and Professions Code Section 17200.  Defendants have actively and intentionally interfered with Plaintiff's existing and prospective economic relationships, proximately resulting in monetary damages to the Plaintiff.  This case involves the element of "state action," and the Defendants should be considered "state actors" because they acted at the behest of some of the most influential politicians in the United States.

3.      Social media have come under tremendous public scrutiny as a result of their obvious censorship of views that do not comport with those promoted by the mainstream media and powerful government officials.  The executives who lead these platforms believe that they can act with impunity, shielded by the "gift" of immunity afforded them by Section 230 of the

2

Communications Decency Act ("CDA"), a law that was originally intended to shield Internet service providers from liability for taking action to protect children from pornographic material. Social media platforms instead have used the CDA as a "get out of jail free" card nearly every time they have been called to court to account for their actions.  The appropriate scope of Section 230, and specifically whether Section 230 empowers social media platforms to censor politically unpopular viewpoints, has garnered so much public attention that President Trump recently issued an Executive Order on the subject.  In addition, Attorney General Barr has formed a working group of state Attorney Generals to analyze issues related to Section 230, Senator Josh Hawley of Missouri has introduced a bill to combat censorship on social media platforms, and the issue of censorship has become a matter of widespread concern and public debate. Congressional committees have taken sworn testimony from executives of large social media platforms such as Defendants Alphabet, Google and YouTube, along with non-parties Facebook, Instagram, Twitter, and similarly powerful operations (collectively, "Big Tech").  In today's political climate of extreme division and animus, often driven by individuals and institutions' polarized views of the current administration, it is mostly (but not entirely) conservative views that have been demonetized, demonized, and deleted.

4.      This lawsuit presents issues related to the proper interpretation of Section 230, the breadth of the immunities Congress gave to social media platforms, the harms associated with the expansion of those immunities beyond what Congress legislated and intended, and the harm and damage caused to Plaintiff, who has expressed his eclectic political and journalistic views and research primarily but not exclusively on the YouTube platform, garnering hundreds of thousands of followers and millions of viewers.  Although not a class action, this lawsuit's impact on the American people, their freedom of speech and their ability to access the public debate cannot be overstated.

## GENERAL BACKGROUND OF THE PLAINTIFF

5.      Marshall Daniels, a 26-year-old African-American man from a modest background, has been creating social, political and educational social commentary since at least 2015.  Despite his relative youth, Mr. Daniels has life experience beyond his years, with rough

COMPLAINT

1  beginnings in urban upstate New York, a short prison term for a weapons possession offense, and

2  a post-prison "rebirth" as a prominent educator, spiritual leader, motivational speaker, journalist,

3  researcher, and social commentator in the African-American community.  Mr. Daniels has

4  advocated the questioning and transformation of modern American culture and unification

5  between white people and black people, asking his audience, which is largely urban and African-

6  American, to "wake up," to ask questions, and to educate themselves about political, racial and

7  socioeconomic issues.  He describes himself as a teacher, a scholar, a musician, a fighter, and a

8  father.

9        6.      Mr. Daniels began uploading videos and live commentary to YouTube on July 20,

10  2015.  In fewer than five years, Mr. Daniels' teachings and commentary have become so

11  influential that he has amassed more than 465,000[1] subscribers on his YouTube channel ("Young

12  Pharaoh"), more than 244,000 followers on Instagram (@pharaoh_aten), and approximately

13  52,800 followers on Twitter (@pharaoh_aten).[2]  According to YouTube's published statistics,

14  Daniels' 760 uploaded videos have been viewed more than 46,292,256 times as of the date of this

15  Complaint.  According to published analytics, out of the more than 650,000 channels on

16  YouTube, the Young Pharaoh channel's global rank is 33,841st worldwide and 10,696th in the

17  United States. In the last 30 days, the Young Pharaoh YouTube channel received more than

18  141,087 views per day on average; it currently attracts nearly 12,000 new subscribers each week.

19  Members of the public have even created "fan" accounts on social media dedicated to Mr.

20  Daniels' commentary.

21

22

23       [1] These numbers climb by the day even though there are serious questions about whether

24  the platforms Mr. Daniels uses have depressed the rate of his channels' growth.  For example, Instagram has depressed the Young Pharaoh channel in its search results so that it is nearly

25  impossible for interested viewers to find.

26       [2] Mr. Daniels is informed and believes that the reason he has so many followers on other platforms but only approximately 44,000 on Twitter is that Twitter has "shadowbanned" him.

27  Shadowbanning is a practice by which a social-media user or content creator's account is removed or depressed from search results on a platform, making it difficult for interested individuals to find

28  that user or content creator.  As described in the previous footnote, Mr. Daniels also appears to have been shadowbanned on Instagram.

COMPLAINT

7.      Mr. Daniels is the registered owner of the trademark YOUNG PHARAOH in international class 35 for "promoting public awareness of spiritual, mental and physical liberation."  YOUNG PHARAOH bears United States Trademark Serial Number 87284746 and Registration Number 5338414.

8.      Recently, politicians from all areas of government have demanded that Big Tech take down content with which they disagree—i.e., content that they consider "harmful," "offensive," "conspiracy theories" and the like.  Since these demands have begun, Mr. Daniels has experienced numerous takedowns of his videos by the Defendants from the YouTube platform, resulting in both a loss of revenue and a loss of the distribution of his commentaries and views.  In addition, the takedowns have deprived Mr. Daniels' followers of the ability to hear his views.

9.      On April 21, 2020, Mr. Daniels live-streamed a video entitled "Fauci Silenced Dr. Judy Mikovits from Warning the American Public," which addressed political and scientific issues related to vaccinations and COVID-19.  Google and YouTube removed the video without informing Mr. Daniels, who learned of the takedown from one of his subscribers.  Google and YouTube indicated that the video was taken down because "it violates our Community Guidelines."  However, when Mr. Daniels contacted Google Support to appeal the decision, no information was provided about *what* in the video purportedly violated "Community Guidelines."  Defendants sent no emails or other messages to Mr. Daniels to explain *why* the video purportedly violated "Community Guidelines."  When Mr. Daniels communicated directly with Google Support via the "chat" feature provided by YouTube, Google Support indicated it would "look into this so I can share more" and promptly terminated the "chat" session after Mr. Daniels indicated that he felt his channel was being targeted and that there was nothing wrong with the video.  Google Support indicated it would email Mr. Daniels "within the day regarding this concern."  Mr. Daniels uploaded the video again, and again it was deleted on the ground that "This video has been removed for violating YouTube's Community Guidelines."  However, nothing in the video was obscene, targeting, or harassing, nor did the video promote violence:  it was purely political, journalistic, and scientific commentary.

10.    On May 28, 2020, Mr. Daniels live-streamed a video entitled, "George Floyd, Riots & Anonymous Exposed as Deep State Psyop for NWO," which addressed political issues related to the nationwide protests following the death of George Floyd at the hands of a Minnesota police officer.  This video reached 1.3 million views in 3 days and was viewed 1,787,135 times before YouTube deleted it.  In the video, Mr. Daniels opposed the decision of some African-Americans to "go out and riot" in response to Mr. Floyd's death, indicating "you are all going to get us killed."  He encouraged his followers[3] to "think" and communicated his view that the protests are the result of an operation to cause civil unrest, unleash chaos and turn the public against the President.[4]  In the video, Mr. Daniels urged African-Americans to stop contributing to social discord.  He criticized the mayor of Minneapolis for the manner in which he handled the George Floyd incident and its aftermath, criticized the police response, criticized George Floyd himself, and questioned the motives of the Antifa movement.  However, when one attempts to view this video, which was previously located at

https://www.youtube.com/watch?v=qW5-srjuCbg, it is not available because, YouTube states, "This video has been removed for violating YouTube's policy on harassment and bullying." After the video was removed, Mr. Daniels contacted Google Support through the chat feature provided by YouTube, where "John" indicated that the video was removed for a "warning on your channel" and informed Mr. Daniels that he could appeal.  However, Mr. Daniels had already submitted an appeal on the ground that nothing in the video was obscene, targeting, harassing or promoted violence—indeed, its purposes were to bring people together, to convince people not to riot or engage in violence and to defend the President.[5]

---

[3] Mr. Daniels, in addressing his audience, calls them and third parties generally "mothefuckas" or "niggas," a vernacular that is not uncommon among his target audience.  This language may be offensive to some who do not understand the common use of this vernacular, but it is certainly not "obscene" or an incitement to violence.  In any event, this clearly was not the reason that the video was taken down, as Mr. Daniels uses similar language in all of his videos, as do many other YouTubers.  Mr. Daniels has opined that the modern view of the N-word as offensive is inconsistent with its etymology, given its origin in the geographical term "Niger."

[4] That said, Mr. Daniels has indicated that he has no allegiance to the President.

[5] Plaintiff notes that although his Complaint's constitutional claims focus on free speech issues, YouTube's conduct may very well have Sixth Amendment implications.  By banning

6

11.     In addition to taking down Mr. Daniels' popular videos, YouTube has shadowbanned him and refused to allow advertising on his videos or channel, despite his status as a YouTube Partner.  A YouTube Partner is entitled to be paid based on watch time and channel growth via subscriber count.  Despite the steadily increasing popularity of Mr. Daniels' YouTube channel, his revenue was greater when he had 100,000 subscribers than it is now that he has 500,000 subscribers.  According to published statistics, Mr. Daniels should be earning between $3,000 and $4,000 per video uploaded.  The manipulation of the Young Pharaoh channel by YouTube has dramatically decreased Mr. Daniels' revenue.

12.     In Defendant Alphabet's Annual Report filed with the United States Securities Exchange Commission (period ending 12/31/2018), Alphabet admitted that it "has allocated substantial resources to stopping advertising practices and protecting users on the web."  For example, Alphabet disclosed its practice of "removing billions of bad ads from our systems every year to closely monitoring the sites, apps, **and videos where ads appear and blacklisting them when necessary to ensure that ads do not fund bad content**."  Significantly, Alphabet's Annual Report does not define "bad content."  On information and belief, Defendants have arbitrarily concluded that Mr. Daniels' videos are "bad content."

13.     YouTube has also retained monies that Mr. Daniels' fans and followers have donated to him through the YouTube platform's SuperChat function. This function allows third parties to donate monies to content creators such as Mr. Daniels during a "live stream".[6]  During Mr. Daniels' live streams, his subscribers have donated monies earmarked for him, but YouTube has retained those monies despite its contractual agreement that it would share them with Mr. Daniels.  Google represents to its users that "SuperChat and Super Stickers are ways to monetize your channel through the YouTube Partner Program.  These features let your viewers purchase chat messages that stand out and sometimes pin them to the top of a chat feed."  Google and

---

debate about the death of George Floyd and its aftermath, YouTube is promoting a single narrative that could make it difficult to find jurors in the police defendants' criminal case who have been exposed to more than one perspective and thus have kept an open mind about the criminal charges.

[6] This revenue is separate and apart from YouTube Partner advertising revenue.

1  YouTube indicate that videos must comply with "Community Guidelines"; however, YouTube

2  has demonetized and withheld donated money from Mr. Daniels while refusing to identify any

3  specific guidelines that the videos have violated.

4        14.    Although Mr. Daniels' views on YouTube increased by 99% and his watch time

5  increased by 72% in the period between June 2019 and June 2020, his revenue *decreased* by 7%.

6  According to YouTube's own estimator, Mr. Daniels estimated ad revenue during that time

7  period exceeded $180,000.  Based on the number of subscribers to Mr. Daniels' channel, the

8  number of views he generated, and his channel's rank, Mr. Daniels would be earning between

9  $1,400 and $22,500 per month from the content he creates and posts on YouTube had YouTube

10  not deleted his videos, shadowbanned him, and wrongfully converted donations sent by his

11  supporters for its own use and financial benefit.

12        15.    Mr. Daniels is aware that in the past, Plaintiffs who have alleged First

13  Amendment violations against Defendants and other members of Big Tech have lost because Big

14  Tech is comprised of companies, i.e., they have been considered private actors who are not

15  constrained by First Amendment concerns.  However, following the 2016 election and the

16  COVID-19 pandemic, numerous state actors, as described in the next section of this Complaint,

17  have pressed Big Tech into their service to combat what those actors consider to be "harmful"

18  wrongthink on social media, particularly as it relates to the COVID-19 pandemic, the subject of

19  one of Mr. Daniels' banned videos.  In Blum v. Yaretsky, 457 U.S. 991 (1982), the United States

20  Supreme Court stated that state action may be pleaded, presumed or proved where "there is a

21  sufficiently close nexus between the State and the challenged action of the regulated entity so

22  that the action of the latter may be fairly treated as that of the State itself."  The purpose of this

23  requirement is to assure that constitutional standards are invoked only when it can be said that

24  the State is responsible for the specific conduct of which the plaintiff complains.  Where, as in

25  this case, the state has exercised "coercive power or has provided such significant

26  encouragement, either overt or covert, that the choice must in law be deemed that of the state."

27  In this case, Mr. Daniels does not allege that the "state" merely approved or acquiesced in the

28  specific conduct complained of, but, as described in more detail below, provided such significant

8

coercion and/or covert or overt encouragement, and even threats, such that the Defendants'
silencing of Mr. Daniels' voice should be deemed "state action."

**GENERAL BACKGROUND OF THE GOVERNMENT OFFICIALS AND BIG TECH EXECUTIVES IMPLICATED IN BIG TECH'S CENSORSHIP PROGRAM**

16.     Non-party United States Representative Adam Schiff is currently serving his tenth term as a Congressman representing California's 28th Congressional District.  Representative Schiff is the Chair of the House Permanent Select Committee on Intelligence, which oversees the nation's intelligence agencies, including components of the Departments of Defense, Homeland Security, Justice, State and Energy.  Representative Schiff is a non-practicing attorney and a graduate of both Stanford University and Harvard Law School.

17.     Non-party United States Congresswoman and Speaker of the House Nancy Pelosi is the 52nd Speaker of the House of Representatives.  She is second in line to the presidency of the United States.  For more than 31 years, Speaker Pelosi has represented California's 12th District in Congress.  Speaker Pelosi is arguably the most powerful woman in the federal government and indeed, in American history.

18.     Non-Party Sundar Pichai is the Chief Executive Officer of Alphabet, Inc., the parent company of both Google and YouTube.

19.     Non-Party Susan Wojcicki is the Chief Executive Officer of YouTube, LLC.

**GOVERNMENT ACTORS ENCOURAGED, COERCED, AND THREATENED THE BIG TECH GIANTS AND THEIR TOP EXECUTIVES**

20.     <u>Representative Schiff's 2019 Threat:</u>  On February 14, 2019, Representative Schiff sent a letter to Mr. Pichai, which is attached hereto as Exhibit A and incorporated by reference as if it were set forth fully herein ("Schiff 2019 Letter").  The Schiff 2019 Letter was published on official letterhead in Representative Schiff's capacity as a Congressman, his position on the Permanent Select Committee on Intelligence, and his position as an *ex officio* member of the Committee on Appropriations.  The text of the Schiff 2019 Letter and a press release announcing its existence were posted on Representative Schiff's official website and can be found at https://schiff.house.gov/news/press-releases/schiff-sends-letter-to-google-facebook-

COMPLAINT

1   regarding-anti-vaccine-misinformation.  The Schiff 2019 Letter was published on official

2   Congressional letterhead.  In the 2019 Schiff Letter, Representative Schiff indicated that that he

3   had "discussed with [Mr. Pichar] in other contexts" that Google's algorithms "are not designed

4   to distinguish quality information from misinformation, and that the consequences of that are

5   particularly troubling for public health issues."  Congressman Schiff indicated that he was

6   "pleased to see YouTube's recent announcement that it will no longer recommend videos that

7   violate its community guidelines, such as conspiracy theories or medically inaccurate videos, and

8   *encourage* further action to be taken related to vaccine misinformation."  Representative Schiff

9   also demanded that Google respond to numerous questions, menacingly "reminding" Mr. Pichar

10   that "[a]s more Americans rely on your services as their primary source of information, it is vital

11   that you take that responsibility with the seriousness it requires, and nowhere more so than in

12   matters of public health and children's health."  See Exhibit A.  A few months later, at a July 16,

13   2019, hearing before the Senate Judiciary Committee on the issue of search-engine censorship,

14   Google representative Karan Bhatia informed the Senators in attendance that Google had begun

15   "targeting" anti-vaccination speech.

16        21.    Representative Schiff's 2020 Demands:  On April 29, 2020, in the wake of the

17   COVID-19 pandemic, Representative Schiff sent a letter to Sundar Pichai and Susan Wojcicki.

18   The letter is attached hereto as Exhibit B and incorporated by reference as if it were set forth in

19   full herein ("Schiff 2020 Letter").  The Schiff 2020 Letter was published on official Congressional

20   letterhead and signed by "Adam B. Schiff, Member of Congress" in his official capacity and as the

21   Chairman of the Permanent Select Committee on Intelligence and an *ex officio* member of the

22   Committee on Appropriations.  The Schiff 2020 Letter was also published on Representative

23   Schiff's official Twitter account, @RepAdamSchiff, an account with more than 2.3 million

24   followers.  It was "liked" by more than 12,700 other Twitter users and was directly retweeted

25   more than 5,400 times; see https://twitter.com/RepAdamSchiff/status/1255902443390599169.

26   The post on Twitter was retweeted by YouTube CEO Susan Wojcicki, see

27   https://twitter.com/SusanWojcicki/status/1256304911446208512.  Ms. Wojcicki responded

28   directly to Representative Schiff and acknowledged her company's "partnership" with

Representative Schiff and other government actors or Congress itself: "Thanks for reaching out. @YouTube, we're working every day to protect people from misinformation and help them find authoritative information. **We appreciate your partnership** and will continue to consult[7] with Members of Congress as we address the evolving issues around #COVID19." (Emphasis added.) See Exhibit C. Ms. Wojcicki also appeared on CNN and acknowledged that YouTube would comply with Representative Schiff's request—to "raise authoritative information"—and promised that YouTube would identify, remove and delete videos that were "medically unsubstantiated" or that disagreed with the World Health Organization.

22.     The Schiff 2020 Letter addressed the public health crisis and what Representative Schiff described as the need for Americans "to receive the best information possible so that they can keep themselves, their families and their communities healthy." After providing examples of content that the Congressman deemed "harmful medical information," he urged the letter's recipients to take action as follows:

> Though the best protection is removing or downgrading harmful content before users engage with it, that is not always possible. As you are likely aware, Facebook recently announced plans to display messages to any users who have engaged with harmful coronavirus-related misinformation that has since been removed from the platform and connect them with resources from the World Health Organization. ***I urge you to adopt a similar practice for YouTube users*** and others who engage with harmful information on your platform, to proactively inform them and direct them to authoritative, medically accurate resources. **While taking down harmful misinformation is a crucial step**, mitigating the harms from false content that is removed requires also ensuring that those users who accessed it while it was available have as high a likelihood of [sic] possible of viewing the facts as well.

See Exhibit B. On information and belief, the purpose and effect of the Schiff 2020 Letter was to pressure Alphabet and its subsidiaries (including Google and YouTube) into doing Representative Schiff's bidding through the veiled threat that attends a public directive issued by a powerful member of Congress with significant power to institute and force the passage of laws to regulate Alphabet and its subsidiaries in innumerable ways that would affect its business operations.

---

[7] The standard definitions of the term "consult" are to "have regard to," "ask the advice of opinion of" or to "deliberate together," an act that occurs *before* a decision is made. See https://www.merriam-webster.com/dictionary/consult.

23. <u>Speaker Pelosi's Threat to Strip Big Tech of Section 230 Protections:</u>  During a podcast with Silicon Valley journalist Kara Swisher, Speaker Pelosi made the following statement about CDA 230 immunity: "It is a gift to them and I don't think that they are treating it with the respect that they should, and so I think that that could be a question mark and in jeopardy… I do think that for the privilege of 230, there has to be a bigger sense of responsibility on it. And it is not out of the question that that could be removed."

24. <u>Speaker Pelosi's June 2020 Threat:</u>  On June 16, 2020, Speaker Pelosi participated in an international Georgetown University Institute on Data Democracy and Politics event titled "Forum on COVID-19 Social Media Disinformation," which was livestreamed on YouTube.  The forum's events included working groups whose stated purpose was to combat "disinformation."  The participants included both government officials and representatives from various social media platforms.  The event moderator described Speaker Pelosi as a "very influential leader[]."  Speaker Pelosi stated, "The American people, including social media platform employees, are demanding an end to the exploitation of the public's health, financial security, and lives.  Congress, employees, advertisers, and the public must work as one to shine a bright light on the division and the disinformation proliferating online.  And together, we must send a message to social media executives. You will be held accountable for your misconduct."

25. <u>Types of Power Wielded by the State Actors:</u>  Although Representative Schiff and Speaker Pelosi may not have the power to pass legislation on their own, they certainly wield influence sufficient to coerce and substantially encourage the Defendants and, on information and belief, have done so.  This power is wielded through not only inquiry letters and demand letters (examples of which include the Schiff letter) but also public statements (such as those made by Speaker Pelosi and Representative Schiff).  Furthermore, both Representative Schiff and Speaker Pelosi represent California, where all of the Defendants have their principal places of business.  Although the inquiry and demand letters may not have the same force of law as a subpoena, private individuals and companies ignore those letters at their peril.  In addition, the state actors referenced above have the power to call the Defendants' executives before various committees and bodies of Congress to testify, as they did in 2018 and 2020.  Efforts are reportedly underway

12

to summon various of these executives before Congress or one of its committees yet again in the near future.

26.     In an immediate response to the Schiff 2020 Letter, YouTube's CEO Susan Wojcicki tweeted her acknowledgement of, support of and compliance with Representative Schiff's demands, confirming the "partnership" between state actors and YouTube. Furthermore, both YouTube CEO Wojcicki and Alphabet CEO Pichai give regular contributions to Google LLC NetPac, a political action committee that facilitates Google employees' political contributions.  Google NetPac LLC, in turn, has made political contributions to the Democratic Senatorial Campaign Committee ("DSCC"), Schiff for Congress, and Nancy Pelosi for Congress. Both Defendants' compliance with Representative Schiff and Speaker Pelosi's demands and the Defendant-controlled PAC's contributions to those same politicians suggest that the state actors are exercising control over the Defendants and that YouTube, as confirmed by its CEO, is in "partnership" with the state actors.

27.     Based on information and belief, Defendants have complied with the demand of the state actors to "raise authoritative content," a form of censorship sometimes called "flooding" or "reverse censorship."  Reverse censorship can distort or drown out disfavored content through the creation and dissemination of favored content.  For example, on the subject of COVID-19, Defendants have not only banned disfavored or allegedly "bad content" videos such as those of Mr. Daniels but also "flooded" the YouTube platform with the demanded "authoritative content" through banners, videos, messages, and links to the World Health Organization and other groups that support the message favored by Representative Schiff and Speaker Pelosi.

28.     The removal, demonetization and suppression of Mr. Marshall's political views embodied in his videos by Defendants is akin to the removal of books from a library, except this "private" library has done so at the behest of members of Congress. These actions implicate significant speech interests, not only of Mr. Daniels but also of those who wish to hear him, and the partnership between the Defendants and influential members of Congress on these issues shines a bright light on the manipulation of what content is created and distributed on matters of national importance for the public to hear, see, and debate.

**DEFENDANTS ACTED BASED IN RESPONSE TO GOVERNMENT ACTORS'
THREATS, COERCION AND/OR ENCOURAGEMENT**

29.     Stifling Public Debate on Issues of Public Health and the COVID Crisis:  In direct response to threats, coercion and encouragement by the government actors referenced above, Defendants censored, demonetized and suppressed content created by Mr. Daniels—along with that of other influencers, commentators, journalists, professionals (including licensed medical doctors) and members of the public who criticize the preferred positions of the government actors—under the guise of protecting public health and preventing access to "disinformation."  For example, on or around April 27, 2020, Defendants deleted a video of two California doctors, Dr. Dan Erickson and Dr. Artin Massihi, who shared raw data that they obtained in Kern County, California, concerning the COVID-19 virus and questioned whether the data justified shutting down the country.  In the first week of May 2020, Defendants banned a video posted by Dr. Judy Anne Mikovits, an American research scientist, entitled "Plandemic."  In the video, Dr. Mikovits questioned the origin of the COVID-19 virus, the efficacy of medicines to treat it, and the efficacy of wearing masks.  Tesla's Chief Executive Officer, Elon Musk, shared the video before it was taken down, commenting, "Docs make good points."

30.     Stifling Public Debate on Issues Relating to the Death of George Floyd and Its Aftermath:  After George Floyd was killed by police officers in Minneapolis, the country erupted in protests and riots.  Defendants censored, demonetized, and suppressed content that questioned the legitimacy of the protests and riots.  In Mr. Daniels' case, a video entitled "George Floyd, Riots & Anonymous Exposed as Deep State Psyop for NWO" was deleted after it was viewed 1,787,135 times.  Other platforms also complied with the directives of the government actors specified here (and those of other powerful politicians).  For example, Twitter removed President Trump's video tribute to George Floyd and placed a "public interest" notice on his tweet warning that the creation of an "Autonomous Zone" in Washington, D.C., similar to the one in Seattle would be met with force; GoFundMe deleted Candace Owens' campaign to raise money for an Alabama bar whose co-owner had criticized the protests.  Various other government actors lambasted social media platforms for allowing the expression of dissenting views, characterizing

14

those views as conspiracy theories, racist, or unsupportive of the Black Lives Matter movement. In response, the Defendants banned and/or demonetized Mr. Daniels and others who questioned what the public has been told about George Floyd's death and its aftermath.  For example, Defendants demonetized the online newspaper *Zero Hedge* from its Google Ads program after it published an article calling the Black Lives Matter movement "practically a revolutionary operation."  In a separate incident, after readers of *The Federalist* posted comments with which Defendants disagreed, Google warned the publication that it would be demonetized if it did not silence its readers by removing the comments section from its website.

## THE BACKGROUND OF THE COMMUNICATIONS DECENCY ACT

31.     The Communications Decency Act ("CDA") was enacted "primarily to protect minors from harmful online viewing."  Section 230 of the CDA is a "Good Samaritan" provision that, among other things, immunizes computer-software providers from liability for actions taken to help users block certain types of unwanted online material.  More specifically, 47 U.S.C. § 230(c)(2) immunizes Internet service providers from liability for giving Internet users the technical means to restrict access to material that "the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable."

32.     47 U.S.C. § 230(c)(2) grants broad immunity to any interactive computer service that blocks content it considers to be "obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable."  Under a plain reading of the statute, Section 230(c)(2) offers broad protection.  However, with respect to what the phrase "otherwise objectionable" was intended to capture, the law is less clear.  For example, the Ninth Circuit recently held that the term "otherwise objectionable" does not encompass actions motivated by purely anticompetitive concerns, reasoning that the term "otherwise objectionable" should cover only content and actions that have some connection to the statutory aims of Section 230, which, as set forth above, was to protect children and other Internet users from certain types of obscene, violent, or harassing material.

33.     The statutory aims of Section 230 include the following:

-   Promoting the continued development of the Internet and interactive computer services;

-   Preserving the "vibrant and competitive free market" for the Internet and interactive computer services;

-   Encouraging the development of technologies that "maximize user control"; and

-   Removing barriers to the "development and utilization of blocking and filtering technologies" that help restrict minors' access to indecent online content.

**INJUNCTIVE RELIEF**

34.     Plaintiff is entitled to preliminary and permanent injunctions.  Defendants are acting and threatening to act under color of state law, both in a nexus with the government and in joint action with the government, to deprive Plaintiff of his constitutional rights.  Plaintiff will suffer irreparable injury and will continue to suffer a real and immediate threat of irreparable injury as a result of the continued censorship of his political speech on YouTube.  Plaintiff has no plain, adequate, or speedy remedy at law.

**GENERAL ALLEGATIONS**

**A.     Jurisdiction and Venue**

35.     This is a civil action seeking damages, declaratory relief, and injunctive relief under the laws of the United States, including but not limited to the First Amendment, the Equal Protection Clause, and 42 U.S.C. § 1983.  Plaintiff also seeks damages and injunctive relief under California state law, where not preempted by Federal law.

36.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1332 (diversity), 28 U.S.C. § 1343 (civil rights), 42 U.S.C. § 1983 (civil rights), 28 U.S.C. § 2201 (declaratory relief), and 28 U.S.C. § 1367 (supplemental jurisdiction).

37.     Plaintiff's claims for declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201 and 2202, Rules 57 and 65 of the Federal Rules of Civil Procedure, and the general legal and equitable powers of this Court.  Plaintiff's claims for nominal, actual, and punitive damages are authorized by 42 U.S.C. § 1983.

16

38.     This Court has personal jurisdiction over Defendants because they have "continuous, systematic" ties to California and/or their principal places of business are within this District.

39.     Venue in this District is proper because a substantial part of the acts and omissions giving rise to the claims occurred in this district and the parties have selected the Northern District of California pursuant to written contracts (contained in Defendants' Terms of Service), which bind the parties.

**B.**     **The Parties**

40.     Plaintiff Marshall Daniels at all relevant times herein was a resident of Erie County, New York.  Marshall Daniels is known by his community and on social media as "Young Pharaoh," consistent with his registered trademark.

41.     Defendant Alphabet, Inc., is a Delaware corporation with its principal place of business in Mountain View, California.  Alphabet, Inc., is the parent company of both Google and YouTube.

42.     Defendant Google, LLC, is a Delaware corporation with its principal place of business in Mountain View, California.

43.     Defendant YouTube, LLC, is a Delaware limited liability company with its principal place of business in San Mateo, California.

44.     Defendants DOES 1 through 5 are responsible in some manner for the events and happenings herein alleged, as well as for the damages alleged.

45.     DOES 6 through 10 are responsible in some manner for the events and happenings herein alleged, as well as for the damages alleged.

**FIRST CLAIM FOR RELIEF**

**(Freedom of Speech – First Amendment)**

**(Against All Defendants)**

46.     Plaintiff incorporates and realleges the allegations contained in the preceding paragraphs as if set forth in full herein.

17

47.     The First Amendment to the United States Constitution protects the right to free speech.

48.     By reason of the speech restrictions set forth above, including but not limited to the removal of Plaintiff's educational and political videos, Defendants, encouraged and coerced under color of law by government actors, have deprived Plaintiff of his right to engage in protected speech in violation of the Free Speech Clause of the First Amendment and 42 U.S.C. § 1983 in that Defendants are preventing Plaintiff from expressing a message based on its content and viewpoint, thereby denying him a forum to express views that various government actors find unacceptable.

49.     The restriction on Plaintiff's speech is content- and viewpoint-based in violation of the Free Speech Clause of the First Amendment.

50.     Defendants' true purpose in adopting the conduct at issue here was to silence the disfavored viewpoints expressed by Plaintiff's speech, in violation of the Free Speech Clause of the First Amendment to the United States Constitution.

51.     YouTube acts as a state actor because it has taken down videos by Plaintiff (and videos expressing similar views by other YouTube content creators) based on the encouragement, coercion, and/or threats of powerful government officials, including but not limited to Representative Adam Schiff and Speaker of the House Nancy Pelosi.  Accordingly, YouTube performs an exclusively and traditionally public function by regulating free speech, which cannot be  arbitrarily, unreasonably, or discriminatorily excluded, regulated, or restricted on the basis of the viewpoint or identity of the speaker.

52.     Plaintiff's videos, which are designed to educate the public, particularly the black community, on history, philosophy, spirituality, and current events, constitute expressive speech and activity protected by the First Amendment to the United States Constitution.

53.     YouTube has restricted Plaintiff's speech and expressive conduct based on subjective, vague, and overbroad criteria that give YouTube unfettered and unbridled discretion to censor speech for any or no reason, no matter how arbitrary or capricious.  Those criteria fail to convey a sufficiently definite warning to Plaintiff and the public as to what is prohibited or

restricted. YouTube's adoption and application of those criteria violated Plaintiff's right to free speech as guaranteed by the First Amendment. YouTube has misused its policies and procedures to censor Plaintiff, who has repeatedly asked what he has done wrong, what he could do differently, or how he could change his videos so that they could be reinstated, but YouTube has never meaningfully answered those questions.

54. YouTube also applies its censorship criteria, including the Terms of Use and Community Guidelines, as a pretext to censor and restrict Plaintiff's speech based on both the content of the speech (pursuant to the government's directions) and Plaintiff's political viewpoints. YouTube's application of its criteria and corresponding restraints on Plaintiff's speech is arbitrary and capricious and/or is based on political, religious, or other animus towards the identity and viewpoints of the speaker, not the actual content of the speech.

55. Plaintiff is being restrained and punished because YouTube prevents his fans and followers from accessing and commenting on his political speech. Accordingly, YouTube's actions impinge on and violate Plaintiff's right to free association and assembly.

56. When they censored Plaintiff's speech, Defendants were acting pursuant to government actions and threats against them, express or implied, that compelled them to take a particular action, to wit, to take down YouTube videos that contradicted the views of powerful government officials and agencies.

57. In the alternative, when they censored Plaintiff's speech, Defendants were acting jointly with the government to take down YouTube videos that contradicted the views of powerful government officials and agencies.

58. The material taken down by Defendants was not obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable.

59. When Defendants took down Plaintiff's material, they were not acting in good faith.

60. No compelling, significant, or legitimate reason justifies Defendants' actions. Even if such interests did exist to justify YouTube's restriction and demonetization rules generally, the restrictions imposed on Plaintiff's speech are not narrowly or reasonably tailored to further such

19

interests because they sweep within their ambit political speech that does not violate YouTube's rules in any way.  Given Google/YouTube's monopolistic control over search results, including both video search results and online video streaming, Plaintiff has no alternative if he wishes to have a reasonable opportunity to reach his intended audience.

61.     YouTube's discriminatory policies and application of those policies are not viewpoint neutral, are unreasonable in time, place, and manner, and are unreasonable in relation to the nature, purpose, and use of the forum.  They impose an unreasonable prior restraint on Plaintiff's protected political speech, motivated by the desire to discriminate against Plaintiff's viewpoint.

62.     YouTube's wrongful actions were taken with oppression, fraud, malice and/or are arbitrary and capricious, and as part of its normal course of business, were effectuated through both the Google/YouTube algorithms and human agents.  Furthermore, YouTube acted with the intent to deprive Plaintiff and his viewers of their rights under the United States Constitution.

63.     As a direct and proximate result of Defendants' violations of clearly established law under the First Amendment, Plaintiff has suffered, and continues to suffer, immediate and irreparable injury in fact, including lost income, reduced viewership, and damage to his brand, reputation, and goodwill, for which there exists no adequate remedy at law.

## SECOND CLAIM FOR RELIEF

### (Breach of the Covenant of Good Faith and Fair Dealing)

### (Against Defendant YouTube LLC and Does 1 through 10)

64.     Plaintiff incorporates and realleges the allegations contained in the preceding paragraphs as if set forth in full herein.

65.     Plaintiff and Defendant entered into a contract.

66.     Plaintiff did all or substantially all of the significant things that the contract required him to do, or he was excused from having to do those things.

67.     All conditions required for Defendant's performance had occurred.

68.     Defendant unfairly interfered with Plaintiff's right to receive the benefits of the contract by, *inter alia*, taking down Plaintiff's videos, demonetizing Plaintiff's YouTube channel, and keeping donations sent by Plaintiff's YouTube fans to him through the platform for itself.

69.     As a result of the wrongful conduct described above, Plaintiff has suffered damages and seeks an award of compensatory damages in excess of the jurisdictional minimum of this Court.

70.     Plaintiff is also entitled to his costs of suit.

## THIRD CLAIM FOR RELIEF

### (Conversion)

### (Against Defendant YouTube LLC and Does 1 Through 10)

71.     Plaintiff incorporates and realleges the allegations contained in the preceding paragraphs as if set forth in full herein.

72.     Plaintiff owned, possessed, and/or had a right to possess donations that were made to him through his YouTube channel by his fans and followers.

73.     Defendant YouTube has intentionally and substantially interfered with Plaintiff's property that was rightfully owned by Plaintiff by withholding that property from him after it was donated by his fans and followers in an amount exceeding the jurisdictional minimum of this Court for diversity cases.

74.     Plaintiff did not consent to give Defendant YouTube his property.

75.     Plaintiff was harmed in that he suffered substantial economic loss.

76.     Defendant YouTube's conduct was a substantial factor in causing Plaintiff's harm.

77.     As a result of the wrongful conduct described above, Plaintiff has suffered damages and seeks an award of compensatory damages in excess of the jurisdictional minimum of this Court.

78.     Plaintiff is also entitled to his costs of suit.

79.     Plaintiff is informed and believes, and thereupon alleges, that in performing the acts herein alleged, Defendant YouTube acted with oppression, fraud, and malice, or alternatively,

21

1   acted in such conscious disregard of his rights, that he is entitled to punitive damages to punish

2   Defendant YouTube and to deter such conduct in the future, in an amount to be determined at trial.

### FOURTH CLAIM FOR RELIEF

### (Unjust Enrichment)

### (Against YouTube, LLC and Does 1 Through 10)

80.    Plaintiff incorporates and realleges the allegations contained in the preceding paragraphs as if set forth in full herein.

81.    On information and belief, Defendant YouTube is in receipt of benefits and has unjustly retained those benefits at the expense of Plaintiff.

82.    As a result of Defendant YouTube's unjust enrichment, Plaintiff is entitled to restitution and/or the imposition of a constructive trust over the benefits referenced in the preceding paragraph.

83.    Plaintiff is also entitled to his costs of suit.

### FIFTH CLAIM FOR RELIEF

### (Breach of Contract)

### (Against Defendant YouTube, LLC and Does 1 Through 10)

84.    Plaintiff incorporates and realleges the allegations contained in the preceding paragraphs as if set forth in full herein.

85.    A valid contract, to wit, YouTube's Terms of Service for content creators, exists between the parties; that contract can be found at https://www.youtube.com/static?template=terms. In the contract, YouTube agreed to do, *inter alia*, the following:  (1) inform Plaintiff when one of his videos was flagged, stricken, or taken down; (2) provide an appeals process; (3) permit the posting of Plaintiff's videos unless they violated YouTube's Community Guidelines; and (4) pay Plaintiff based on, among other things, views and donations.

86.    Plaintiff did all, or substantially all, of the significant things that the contract required him to do; alternatively, Plaintiff was excused from doing them.

87.    Defendant YouTube failed to comply with the contract in that it failed to do any of the things that it was required to do that are set forth in paragraph 85 above.

88.     Plaintiff has been harmed by Defendant YouTube's failure to comply with the contract.

89.     As a result of the foregoing, Plaintiff has suffered damages and seeks an award of compensatory damages in an amount in excess of the jurisdictional minimum of this Court.

90.     Plaintiff is also entitled to specific performance of the contract.

91.     Plaintiff is also entitled to his costs of suit and attorney fees pursuant to the contract.

## SIXTH CLAIM FOR RELIEF

### (Money Had and Received)

### (Against Defendant YouTube, LLC and Does 1 Through 10)

92.     Plaintiff incorporates and realleges the allegations contained in the preceding paragraphs as if set forth in full herein.

93.     Within the last two years, Defendant YouTube held money for the use and benefit of the Plaintiff.  These monies were provided by Plaintiff's fans and followers as donations to Plaintiff.  However, Defendant YouTube has withheld that money from Plaintiff.

94.     As a result, Plaintiff is entitled to a turnover of the donations and seeks a judgment providing for that remedy.

## SEVENTH CLAIM FOR RELIEF

### (California Business and Professions Code Section 17200)

### (Against Defendant YouTube, LLC and Does 1 Through 10)

95.     Plaintiff incorporates and realleges the allegations contained in the preceding paragraphs as if set forth in full herein.

96.     Plaintiff is informed and believes, and on that basis alleges, that Defendant YouTube engaged in practices in violation of Plaintiff's rights under California's Unfair Competition Law ("UCL") Section 17200 of the California Business and Professions Code.

97.     The conduct of Defendant YouTube constitutes unfair competition under section 17200 because it unlawfully engaged in a business act that resulted in damages and harm to Plaintiff.  Specifically, Defendant held itself out as a platform where content creators could exhibit

23

their work in exchange for a share of any profits.  In reality, Defendant removed a portion of Plaintiff's content and refused to pay Plaintiff for the monies he had already earned.

98.    Furthermore, the conduct of Defendant YouTube constitutes unfair competition under section 17200 because it engaged in fraudulent business acts or practices when it deprived Plaintiff of money due to him from his fans and followers' donations.

99.    Plaintiff is a person in interest to whom that money must be restored.

100.   Because of Defendant YouTube, LLC's violations of Section 17200, Defendant YouTube is liable to Plaintiff for both restitution and attorneys' fees and costs.

101.   Based on information and belief, Defendant YouTube is continuing to retain donations that belong to Plaintiff and other YouTubers and it is a matter of public concern to stop Defendant YouTube from retaining that money. Among other reasons, because Plaintiff seeks to address an issue of public concern, he is entitled to his attorneys' fees and costs pursuant to the UCL.

## EIGHTH CLAIM FOR RELIEF

### (Fraud in the Inducement)

### (Against Defendant YouTube, LLC and Does 1 Through 10)

102.   Plaintiff incorporates and realleges the allegations contained in the preceding paragraphs as if set forth in full herein.

103.   YouTube represented to Plaintiff that a fact was true: to wit, that in exchange for Plaintiff's content, YouTube would make Plaintiff's content available and monetizable, and that YouTube would direct a portion of any donations received from fans and followers of Plaintiff to Plaintiff.

104.   YouTube's representation was false:  instead of making Plaintiff's content freely available and monetizable, it restricted, demonetized, and took down a portion of the content; instead of turning over Plaintiff's donations, it kept all monies for itself.

105.   YouTube knew these representations were false when it made them; alternatively, it made those representations recklessly and without regard for their truth.

106.   YouTube intended that Plaintiff rely on its representations.

24

107.     Plaintiff reasonably relied on YouTube's representations, as content creators in numerous genres had successfully exhibited and monetized their work on YouTube.

108.     Plaintiff was harmed in that he was unable to communicate his ideas, his revenues have disappeared, and his donations have been stolen.

109.     Plaintiff's reliance on YouTube's representation was a substantial factor in causing his harm.  Before the takedowns and demonetization, Plaintiff had built up an audience of millions of YouTube users and now, Plaintiff is essentially "stuck" on YouTube because those users are not portable.  If Plaintiff had not relied on YouTube's initial representations, he would have chosen a different social media platform.

110.     As a result of the wrongful conduct described above, Plaintiff has suffered damages and seeks an award of compensatory damages in excess of the jurisdictional minimum of this Court.

111.     Plaintiff is also entitled to his costs of suit.

112.     Plaintiff is informed and believes, and thereupon alleges, that in performing the acts herein alleged, Defendant acted with oppression, fraud, and malice, or alternatively, acted in such conscious disregard of his rights, that he is entitled to punitive damages to punish Defendant and to deter such conduct in the future, in an amount to be determined at trial.

## **NINTH CLAIM FOR RELIEF**

### **(Wire Fraud)**

### **(Against Defendant YouTube, LLC and Does 1 Through 10)**

113.     Plaintiff incorporates and realleges the allegations contained in the preceding paragraphs as if set forth in full herein

114.     YouTube represented to Plaintiff that a fact was true: to wit, that in exchange for Plaintiff's content, YouTube would make Plaintiff's content available and monetizable, and that YouTube would direct a portion of any donations received from fans and followers of Plaintiff to Plaintiff.

25

115.   YouTube's representation was false:  instead of making Plaintiff's content freely available and monetizable, it restricted, demonetized, and took down a portion of the content; instead of turning over Plaintiff's donations, it kept all monies for itself.

116.   YouTube knew these representations were false when it made them; alternatively, it made those representations recklessly and without regard for their truth.

117.   In representing that it would direct donations to Plaintiff when it knew those representations were false, YouTube formed a scheme or artifice to defraud.

118.   YouTube used a means of interstate communications—to wit, the Internet—in furtherance of this scheme.

119.   YouTube intended that Plaintiff rely on its representations.

120.   Plaintiff reasonably relied on YouTube's representations, as content creators in numerous genres had successfully exhibited and monetized their work on YouTube.

121.   Plaintiff was harmed in that he was unable to communicate his ideas, his revenues have disappeared, and his donations have been stolen.

122.   Plaintiff's reliance on YouTube's representation was a substantial factor in causing his harm.  Before the takedowns and demonetization, Plaintiff had built up an audience of millions of YouTube users and now, Plaintiff is essentially "stuck" on YouTube because those users are not portable.  If Plaintiff had not relied on YouTube's initial representations, he would have chosen a different social media platform.

123.   As a result of the wrongful conduct described above, Plaintiff has suffered damages and seeks an award of compensatory damages in excess of the jurisdictional minimum of this Court.

124.   Plaintiff is also entitled to his costs of suit.

125.   Plaintiff is informed and believes, and thereupon alleges, that in performing the acts herein alleged, Defendant acted with oppression, fraud, and malice, or alternatively, acted in such conscious disregard of his rights, that he is entitled to punitive damages to punish Defendant and to deter such conduct in the future, in an amount to be determined at trial.

26

1

**PRAYER FOR RELIEF**

2        WHEREFORE, Plaintiff Marshall Daniels asks this Court:

3        A)      To declare that the Defendants' restriction on Plaintiffs' speech including the

4   conduct complained of herein, violates the First Amendment to the U.S. Constitution as set forth

5   in this Complaint.

6        B)      To preliminarily and permanently enjoin Defendants' speech restriction and its

7   application to Plaintiff's speech as set forth in this Complaint;

8        C)      To award Plaintiff damages for his past loss of his constitutional rights as set forth

9   in this Complaint;

10        D)      To award Plaintiff damages for his tort and contract claims against Defendants as

11   set forth in this Complaint;

12        E)      To award Plaintiff his reasonable attorney fees, costs and expenses pursuant to 42

13   U.S.C. § 1988 and other applicable law; and

14        F)      To grant such other and further relief as this Court should find just and proper.

15

16   Dated: July 14, 2020                    ARMENTA & SOL, PC

17

18                                  By:   */s M. Cris Armenta*
                                          M. Cris Armenta
19                                        Attorneys for Plaintiff
                                          Marshall Daniels
20

21

22

23

24

25

26

27

28

COMPLAINT

1

2                            **REQUEST FOR JURY TRIAL**

3          Plaintiff hereby requests a trial by jury.

4   Dated: July 14, 2020                      ARMENTA & SOL, PC

5

6                                       By:   */s M. Cris Armenta*
                                             _____
7                                                  M. Cris Armenta
                                                 Attorneys for Plaintiff
8                                                 Marshall Daniels

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT

**EXHIBIT A**



PERMANENT SELECT
COMMITTEE ON INTELLIGENCE
CHAIRMAN

COMMITTEE ON APPROPRIATIONS
EX-OFFICIO MEMBER

**ADAM B. SCHIFF**
MEMBER OF CONGRESS • 28TH DISTRICT, CALIFORNIA

2269 RAYBURN HOUSE OFFICE BUILDING
WASHINGTON, DC 20515

245 EAST OLIVE AVENUE, SUITE 200
BURBANK, CA 91502

@RepAdamSchiff • schiff.house.gov

February 14, 2019

Sundar Pichai
Chief Executive Officer
Google
1600 Amphitheater Parkway
Mountain View, CA 94043

Dear, Mr. Pichai:

As more Americans use the Internet and social media platforms as their primary source of information, it is important that we explore the quality of the information that they receive, particularly on issues that directly impact the health and well-being of Americans, as well as the billions who use your site around the world. Accordingly, I am writing out of my concern that YouTube is surfacing and recommending messages that discourage parents from vaccinating their children, a direct threat to public health, and reversing progress made in tackling vaccine-preventable diseases.

The scientific and medical communities are in overwhelming consensus that vaccines are both effective and safe. There is no evidence to suggest that vaccines cause life-threatening or disabling diseases, and the dissemination of unfounded and debunked theories about the dangers of vaccinations pose a great risk to public health. In fact, the World Health Organization listed vaccine hesitancy – the reluctance or refusal to vaccinate despite the availability of vaccines – as one of the top threats to global health in 2019. In a dramatic demonstration of the dangers, Washington state declared a public health emergency due to a measles epidemic in Clark County, signaling the resurgence of a potentially fatal disease that was effectively eliminated from the United States decades ago by vaccines.

There is strong evidence to suggest that at least part of the source of this trend is the degree to which medically inaccurate information about vaccines surface on the websites where many Americans get their information, among them YouTube and Google search. As I have discussed with you in other contexts, and as you have acknowledged, the algorithms which power these services are not designed to distinguish quality information from misinformation or misleading information, and the consequences of that are particularly troubling for public health issues. If a concerned parent consistently sees information in their YouTube recommendations that casts doubt on the safety or efficacy of vaccines, it could cause them to disregard the advice of their children's physicians and public health experts and decline to follow the recommended vaccination schedule. Repetition of information, even if false, can often be mistaken for accuracy, and exposure to anti-vaccine content via social media may negatively shape user attitudes towards vaccination.

Additionally, even parents and guardians who seek out accurate information about vaccines could unwittingly reach pages and videos with misinformation. A report by the Guardian[1] found that on both Facebook and YouTube, suggested searches related to vaccines often led users to pages or groups

[1] https://www.theguardian.com/media/2019/feb/01/facebook-youtube-anti-vaccination-misinformation-social-media

providing medically and scientifically inaccurate information.

As a Member of Congress who is deeply concerned about declining vaccination rates around the nation, I am requesting additional information on the steps that you currently take to provide medically accurate information on vaccinations to your users, and to encourage you to consider additional steps you can take to address this growing problem. I was pleased to see YouTube's recent announcement that it will no longer recommend videos that violate its community guidelines, such as conspiracy theories or medically inaccurate videos, and encourage further action to be taken related to vaccine misinformation.

Specifically, I request that you provide answers on the following questions:

- Does content which provides medically inaccurate information about vaccines violate your terms of service?
- What action(s) do you currently take to address misinformation related to vaccines on your platforms? Are you considering or taking additional actions?
- Do you accept paid advertising from anti-vaccine activists and groups on your platforms? How much has been spent in the past year on advertising on this topic?
- What steps do you currently take to prevent anti-vaccine videos or information from being recommended to users, either algorithmically or as a suggested search result?

I appreciate your timely response to these questions and encourage you to consider what additional steps you can take to address this growing problem. As more Americans rely on your services as their primary source of information, it is vital that you take that responsibility with the seriousness it requires, and nowhere more so than in matters of public health and children's health. Thank you for your attention to this important topic.

Sincerely,

**Adam B. Schiff**
Member of Congress

# EXHIBIT B



PERMANENT SELECT
COMMITTEE ON INTELLIGENCE
CHAIRMAN

COMMITTEE ON APPROPRIATIONS
EX-OFFICIO MEMBER

**ADAM B. SCHIFF**
MEMBER OF CONGRESS • 28TH DISTRICT, CALIFORNIA

2269 RAYBURN HOUSE OFFICE BUILDING
WASHINGTON, DC 20515

245 EAST OLIVE AVENUE, SUITE 200
BURBANK, CA 91502

@RepAdamSchiff • schiff.house.gov

April 29, 2020

Sundar Pichai
Chief Executive Officer
Alphabet Inc.
1600 Amphitheatre Parkway
Mountain View, CA 94043

Susan Wojcicki
Chief Executive Officer
YouTube, LLC
901 Cherry Avenue
San Bruno, CA 94066

Dear Mr. Pichai and Ms. Wojcicki:

As we all work to control the COVID-19 pandemic, I want to thank you for the actions you have taken to ensure Google's users are provided with timely, authoritative, and factual sources. I was encouraged to see your early commitment to working closely with other social media companies to jointly combat fraud and misinformation during this societal challenge that transcends any one platform or service.

As we face this public health crisis, Americans want and need to receive the best information possible so that they can keep themselves, their families, and their communities healthy. I commend you for steps you have already taken to highlight information from official health sources and to remove or limit content that promotes harmful medical misinformation. YouTube's commitment to remove videos with information that is medically unsubstantiated or contradicts World Health Organization (WHO) recommendations is an important action to protect the health and safety of billions of users. The recently announced policy of adding links to fact-checking sources for certain searches is a further step towards directing users to accurate health information.

Despite your best efforts, however, users will continue to see and engage with harmful medical content on your platforms, whether by intentionally seeking it out or otherwise. Among the harmful misinformation currently on YouTube, recent reporting has shown that it is easy to find videos spreading false and dangerous statements about the coronavirus or treatments,[1] including conspiracy theories linking the virus to 5G towers, anti-vaccine messages suggesting the virus was engineered, and videos suggesting that drinking or consuming bleach may cure the disease.

Though the best protection is removing or downgrading harmful content before users engage with it, that is not always possible. As you are likely aware, Facebook recently announced plans to display messages to any users who have engaged with harmful coronavirus-related misinformation that has since been removed from the platform and connect them with resources from the World Health Organization. I urge you to adopt a similar practice for YouTube users and others who

---

[1] Rebecca Heilweil, "How the 5G coronavirus conspiracy theory went from fringe to mainstream," *Recode*, Vox Media, April 24, 2020.

engage with harmful information on your platform, to proactively inform them and direct them to authoritative, medically accurate resources.

While taking down harmful misinformation is a crucial step, mitigating the harms from false content that is removed requires also ensuring that those who accessed it while it was available have as high a likelihood of possible of viewing the facts as well.

I recognize the complex challenges that misinformation presents to online platforms such as Google, in this and many other contexts. As we all grapple with this unprecedented health situation, I hope you will consider this suggestion for keeping users better informed. Thank you for your attention to my concerns, and I look forward to continuing our ongoing dialogue on these important issues.

Sincerely,

Adam B. Schiff
MEMBER OF CONGRESS

# EXHIBIT C

Home
Explore
Notifications
Messages
Bookmarks
Lists
Profile
More
Tweet

## Tweet

**Susan Wojcicki** @SusanWojcicki · May 1
Thanks for reaching out. @YouTube, we're working every day to protect people from misinformation and help them find authoritative information. We appreciate your partnership and will continue to consult with Members of Congress as we address the evolving issues around #COVID19.

> **Adam Schiff** @RepAdamSchiff · Apr 30
> Misinformation is dangerous. Misinformation about public health is deadly.
>
> I sent a letter to the CEOs of @Google, @YouTube and @Twitter urging them to proactively inform users when they've interacted with medical misinformation.
>
> They can help save lives.

208 · 42 · 90

## Replies

**Silverblade** @SilverbladeDagg · May 1
Replying to @SusanWojcicki and @YouTube
Ironic that you say this to a Rep who made up a conversation between the President and the leader of Ukraine in a Congress hearing. Perhaps you should just let the free market of ideas decide, instead of censoring truth and lies and mess up both. Do something right for a change.

2 · 28

**Ricardo Medina** @ramthrax · May 1
Replying to @SusanWojcicki and @YouTube
When totalitarianism empowers, it only remains to get out of the system.

> BitChute is a peer-to-peer social video platform.
> BitChute aims to put creators first and provide them with a service that they can use to flourish and express their ideas freely.
> bitchute.com

6 · 23

**Vic-Triol** @Vic_Triol · May 1
Replying to @SusanWojcicki and @YouTube

Search Twitter

## Relevant people

**Susan Wojcicki** @SusanWojcicki
YouTube CEO

**YouTube** @YouTube
Black Lives Matter.

**Adam Schiff** @RepAdamSchiff
Representing Califo Congressional Distri House Intelligence ( @HouseIntel).

## What's happening

Politics · 24 minutes ago
**American Airlines is 'reviev the details' after Ted Cruz v photographed on a flight v wearing a mandatory mask**

**#WannaGetAway**
Book a low fare for your trip.
Promoted by Southwest Airlin

In memoriam · 2 hours ago
**Pregnant YouTube star Nic Thea dies at 24**

Trending in California
**#LAUSD**

Los Angeles Times · 1 ho
**New study suggests the ch of a big San Andreas quake tripled**
Trending with: San Andreas a Ridgecrest

Show more

Terms Privacy policy Cookies
© 2020 Twitter, Inc.