1  **ARMENTA & SOL, PC**
   M. Cris Armenta (SBN 177403)
2  Credence E. Sol (SBN 219784)
   11440 West Bernardo Court, Suite 300
3  San Diego, CA 92127
   Telephone: (858) 753-1724
4  Facsimile: (310) 695-2560
   cris@crisarmenta.com
5  credence@crisarmenta.com

6  Attorneys for Plaintiff MARSHALL DANIELS
   aka Young Pharaoh
7

8              **UNITED STATES DISTRICT COURT**

9          **FOR THE NORTHERN DISTRICT OF CALIFORNIA**

10  MARSHALL DANIELS, also known as       Case No. 5:20:CV-04687-VKD
    Young Pharaoh, an individual,
11                                        **(1)  OPPOSITION OF MARSHALL**
                  Plaintiff,                   **DANIELS TO MOTION TO**
12                                             **DISMISS FILED BY**
    vs.                                        **DEFENDANTS ALPHABET**
13  ALPHABET, INC., a Delaware                 **INC., GOOGLE, LLC, AND**
    corporation; GOOGLE, LLC., a              **YOUTUBE, LLC; and**
14  Delaware limited liability company;
    YOUTUBE LLC, a Delaware limited      **(2)  DECLARATION OF M. CRIS**
15  liability company; DOES 1 through 10,      **ARMENTA**
    inclusive.
16                                        Before: Hon. Virginia K. DeMarchi
                                          Courtroom: 2
17                Defendants.             Hearing Date: October 6, 2020
                                          Time: 10:00 a.m.
18

19

20

21

22

23

24

25

26

27

28

**OPPOSITION TO MOTION TO DISMISS**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. i

I.      INTRODUCTION ............................................................................................. 1

II.     STANDARD .................................................................................................... 2

III.    THE COMPLAINT PROPERLY ALLEGES GOVERNMENT COERCION AND
        ENCOURAGEMENT SUCH THAT THE FIRST AMENDMENT'S
        CONSTITUTIONAL SAFEGUARDS APPLY TO DANIELS' SPEECH ....................... 2

        A.      None of the Cases Defendants Cite Address the Use of Governmental
                Encouragement and Coercion of Social Media Censorship Practices .................... 2

        B.      Under Blum v. Yaretsky, Defendants' Censorship Practices Constitute
                State Action Under Either the Governmental Nexus Test or the Joint
                Action Test .......................................................................................................... 4

        C.      Defendants, in "Partnership" with the Government, Have Engaged in
                Viewpoint Discrimination Against Plaintiff ........................................................ 7

IV.     PLAINTIFF PROPERLY ALLEGES CONTRACT-BASED AND
        IMPLIED COVENANT CLAIMS ....................................................................... 10

        A.      Even under the TOS Proffered by Defendants, A Factual Inquiry is Required
                To Determine Whether YouTube Breached the Contract ..................................... 10

        B.      Whether YouTube Breached Its TOS By Censoring Plaintiffs' Videos
                Calls for a Factual Inquiry into Whether YouTube Held a "Reasonable"
                Belief that Daniels Violated the TOS .................................................................. 12

        C.      YouTube is Not Entitled to Deny Daniels the Benefit of the Contracts/
                Agreements, and Daniels Properly Alleged that Defendants Breached
                the Implied Covenant by Interfering with His Receipt of Benefits in
                Bad Faith ........................................................................................................... 15

V.      PLAINTIFF'S COMMON LAW CLAIMS ARE PROPERLY PLEADED .................... 16

        A.      The Claim for Conversion Requires Only Facts Adequate to Identify the Sum
                Taken by Defendants .......................................................................................... 16

B.    This Circuit Recognizes Unjust Enrichment as an Independent Claim ...............17

C.    To Avoid Another Round of Delay, Plaintiff Will Consent to Voluntary Dismissal Without Prejudice of His Fraud and Wire Claims, but the UCL Claim is Not Predicated on Fraud and Plaintiff Will Not Dismiss It....................18

VI.    SECTION 230 DOES NOT BAR PLAINTIFF'S CLAIMS ..............................................19

VII.   DEFENDANTS' OWN FIRST AMENDMENT RIGHTS DO NOT BAR DANIELS' CLAIMS ......................................................................................................23

VIII.  CONCLUSION....................................................................................................................24

**TABLE OF CONTENTS**

## TABLE OF AUTHORITIES

**FEDERAL CASES**

Adana Jiagbogu v. Bank of America,
    2016 WL 7626249 (C.D. Cal. Dec. 1, 2016) ................................................................. 18

Asurvio, LP v. Malwarebytes, Inc.,
    2020 WL 1478345 (N.D. Cal Mar. 26, 2020) ............................................................... 22

Baker v. Cuomo,
    58 F.3d 814 (2d Cir.), cert. denied sub nom., Pataki v. Baker, 516 U.S. 980 (1005),
    vacated in part on other grounds, 85 F.3d 919 (2d Cir. 1996) (en banc) ......................... 3

Barr v. American Assn. of Political Consultants, Inc.,
    No. 19-631 at *29 (U.S. July 6, 2020) .............................................................................. 8

Batzel v. Smith,
    333 F.3d 1018 (9th Cir. 2003) ......................................................................................... 19

Bivens v. Six Unknown Fed. Narcotics Agents,
    403 U.S. 388 (1971) .......................................................................................................... 1

Blum v. Yaretsky,
    457 U.S. 991 (1982) .............................................................................................. 1, 4, 5, 8, 9

Boos v. Barry,
    485 U.S. 312 (1988) .......................................................................................................... 8

Brandenburg v. Ohio,
    395 U.S. 444 (1969) .......................................................................................................... 9

Broam v. Bogan,
    320 F.3d 1023 (9th Cir. 2003) ........................................................................................... 2

Brunette v. Humane Soc'y. of Ventura Cty.,
    294 F.3d 1205 (9th Cir. 2002) ........................................................................................... 5

Bruton v. Gerber Prod. Co.,
    703 Fed.Appx. 468 (9th Cir. 2017) ................................................................................. 18

Chicago Lawyers' Comm. For Civil Rights Under Law, Inc. v. Craigslist, Inc.,
   519 F.3d 666 (7th Cir. 2008), as amended (May 2, 2008)..................................19

Cohen v. California,
   403 U.S. 15 (1971)..........................................................................................9

Collins v. Womancare,
   878 F.2d 1145 (9th Cir. 1989) ......................................................................4, 5

Coto Settlement v. Eisenberg,
   593 F.3d 1031 (9th Cir. 2010) ..........................................................................2

Cruise-Gulyas v. Minard,
   918 F.3d 494 (6th Cir. 2019..............................................................................9

Eastland v. United States,
   421 U.S. 491 (1975)..........................................................................................6

Ecological Rights Fdn. v. Pac. Gas & Elec. Co.,
   713 F.3d 502 (9th Cir. 2013) ............................................................................2

Elec. Constr. & Maint. Co., Inc. v. Maeda Pac. Corp.,
   764 F.2d 619 (9th Cir. 1985) ............................................................................3

Enhanced Athlete, Inc. v. Google,
   2020 WL 4732209 (N.D. Cal. Aug. 14, 2020) ....................................15, 22, 23

Enigma Software Group USA, LLC v. Malwarebytes, Inc.,
   946 F.3d 1040 (9th Cir. 2019), petition for cert. pending sub nom. Malwarebytes, Inc v. Enigma Software Group USA, LLC, No. 19-1284 (U.S. May 12, 2020) .............20, 21, 22

e-ventures Worldwide, LLC v. Google, Inc.,
   188 F.Supp.3d 1265 (M.D. Fla. 2016)............................................................23

Freedom Watch v. Google, Inc.,
   368 F.Supp.3d 30 (D.D.C. 2019)......................................................................3

George v. Pacific-CSC Work Furlough,
   91 F.3d 1227 (9th Cir. 1996) ............................................................................4

**TABLE OF AUTHORITIES**

*Gilligan v. Jamco Dev. Corp.,*
  103 F.3d 246 (9th Cir. 1997) ...................................................................................2

*Gonzalez v. Google, Inc.,*
  282 F.Supp.3d 1150 (N.D. Cal. 2017) ....................................................................21

*Haskins v. Symantec Corp.,*
  2013 WL 623610 (N.D. Cal. Dec. 2, 2013) ............................................................16

*Hearn v. R.J. Reynolds Tobacco Co.,*
  279 F.Supp.2d 1096 (D. Az. 2003) .........................................................................11

*Heineke v. Santa Clara University,*
  953 F.3d 1009 (9th Cir. 2020) .................................................................................5

*Hepp v. Facebook,*
  2020 WL 3034815 (E.D. Pa. June 5, 2020) ............................................................22

*In re CMR Mortg. Fund, LLC,*
  416 B.R. 720 (N.D. Cal. 2009) ...............................................................................11

*In re Figter Limited,*
  118 F.3d 635 (9th Cir. 1997) ..................................................................................20

*International Audiotext Network, Inc. v. AT&T Co.,*
  62 F.3d 69 (2d Cir. 1995) .......................................................................................11

*Lamps Plus, Inc. v. Varela,*
  ___ U.S. ___, 139 S.Ct. 1407 (2019) .....................................................................14

*Lewis v. Google, LLC,*
  2020 WL 2745253 (N.D. Cal. May 20, 2018) ........................................................13

*Lugar v. Edmonson Oil Co.,*
  457 U.S. 922 (1982) .................................................................................................5

*Luke Records v. Navarro,*
  960 F.2d 134 (11th Cir. 1992) ..................................................................................9

*Manhattan Cmty. Access Corp. v. Halleck,*
  587 U.S. ___, 139 S.Ct. 1921 (2019) ...............................................................3, 4, 5

**TABLE OF AUTHORITIES**

<u>Matal v. Tam</u>,

    582 U.S. ___, 137 S.Ct. 1744 (2017)...........................................................7, 8

<u>McGary v. City of Portland</u>,

    386 F.3d 1259 (9th Cir. 2004) ....................................................................2, 3

<u>Miller v. California</u>,

    413 U.S. 15 (1973)...............................................................................9, 21, 22

<u>Mishiyev v. Alphabet, Inc.</u>,

    444 F.Supp.3d 1154 (N.D. Cal. 2020) .............................................................13

<u>Natomas Garden Inv. Group v. Sinadinos</u>,

    710 F.Supp.2d 1008 (E.D. Cal. 2010)..............................................................17

<u>OSU Student Alliance v. Ray</u>,

    699 F.3d 1052 (9th Cir. 2012) ........................................................................2

<u>Parks Sch. of Bus. Inc. v. Symington</u>,

    51 F.3d 1480 (9th Cir. 1995) ..........................................................................2

<u>Police Department of Chicago v. Mosley</u>,

    408 U.S. 92 (1972) ........................................................................................7

<u>Prager University v. Google, LLC</u>,

    951 F.3d 991 (9th Cir. 2020) ..........................................................................3

<u>Rosenberger v. Rectors and Visitors of the University of Virginia</u>,

    515 U.S. 819 (1995)......................................................................................7

<u>Schulken v. Washington Mut. Bank, Henderson NV</u>,

    2011 WL 4804063 (N.D. Cal. Oct. 11, 2011)....................................................14

<u>Sherman v. Yahoo!, Inc.</u>,

    997 F.Supp.2d 1129 (S.D. Cal. 2014)........................................................19, 20

<u>Shwarz v. United States</u>,

    234 F.3d 428 (9th Cir. 2000) ..........................................................................2

<u>Simon & Schuster, Inc. v. Members of New York State Crime Victims Board</u>,

    502 U.S. 105 (1991)......................................................................................8

**TABLE OF AUTHORITIES**

Song Fi, Inc. v. Google,

    108 F.Supp.3d 876 (N.D. Cal. 2015) ....................................................19, 20, 21

Texas v. Johnson,

    491 U.S. 397 (1989) ................................................................................................8

Trump v. Mazars USA, LLP,

    591 U.S. ___, 140 S.Ct. 2019, 2032 (2020) ...........................................................6

Turner Broadcasting System, Inc. v. Federal Communications Comm'n.,

    512 U.S. 622 (1994) ................................................................................................8

United States v. Biaggi,

    853 F.2d 89 (2d Cir. 1988) ...........................................................................6, 7, 10

United States v. Corinthian Colleges,

    655 F.3d 984 (9th Cir. 2011) .................................................................................2

United States v. Fattah,

    914 F.3d 112 (3d Cir. 2019) ................................................................................10

United States v. Jefferson,

    634 F.Supp.2d 595 (E.D. Va. 2009) ....................................................................10

United States v. Merrill,

    746 F.2d 458 (9th Cir. 1984) ...............................................................................22

United States v. Poocha,

    259 F.3d 1077, 1082 (9th Cir. 2001) ...................................................................21

United States v. Price,

    383 U.S. 787 (1966) ................................................................................................4

Williams v. Albertson Cos.,

    No. 19-16420 (9th Cir. Aug. 5, 2020) (mem.) ......................................................5

Zekleman Indus. Inc. v. Marker,

    2020 WL 1495210 (D. Az. Mar. 27, 2020) ........................................................22

Zeran v. America Online,

    129 F.3d 327 (4th Cir. 1997) ...............................................................................19

**STATE CASES**

Durell v. Sharp Healthcare,

      183 Cal.App.4th 1350 (2010) ...................................................17, 18

Farmers Ins. Exch. v. Superior Court,

      2 Cal.4th 377 (1992) ...........................................................18, 19

Hartford Cas. Ins. Co. v. J.R. Mktg.,

      61 Cal.4th 988 (2015) .............................................................18

Melchior v. New Line Prod., Inc.,

      106 Cal.App.4th 779 (2003) ...................................................17, 18

Olsen v. Breeze, Inc.,

      48 Cal.App.4th 608 (1996) ....................................................18, 19

PCO, Inc. v. Christensen, Miller, Fink, Jacobs, Glaser, Weil & Shapiro,

      150 Cal.App.4th 384 (2007) .......................................................17

Prager University v. Google LLC,

      2019 Super. LEXIS at *31 (Cal. Super. Ct. Nov. 19, 2019)............................13

Supervalu, Inc. v. Wesford Underwriting Managers, Inc.,

      175 Cal.App.4th 64 (2009) .......................................................16


**FEDERAL AND STATE STATUTES**

Cal. Bus & Prof. Code 17200 ...............................................................18, 24

42 U.S.C. 230.................................................................7, 19, 20, 21, 22, 23

42 U.S.C. 230(c) ..................................................................19, 20, 23

42 U.S.C. 1983.............................................................................1

47 U.S.C. 120(c) .........................................................................19


**TREATISES**

C. Wright & A. Miller, Federal Practice and Procedure: Civil § 1357 (1969)................................3

**TABLE OF AUTHORITIES**

**STATE REGULATIONS**

Cal. R. Ct. 8.1105(b) ...................................................................................................13

**LOCAL RULES**

N.D. Local Rule 3-4€ ..................................................................................................13

**TABLE OF AUTHORITIES**

1   Plaintiff Marshall Daniels, an influential social media commentator also known as

2   "Young Pharaoh" ("Daniels" or "Young Pharaoh"), opposes the Motion to Dismiss ("MTD")

3   filed by Defendants Alphabet, Inc. ("Alphabet"), Google LLC ("Google") and YouTube LLC

4   ("YouTube").  Daniels also submits a declaration by M. Cris Armenta ("Armenta Decl.").

5   **I.   <u>INTRODUCTION</u>**

6   This is a civil rights action[1] brought against social media giants that, at the behest of and

7   in partnership with influential and powerful members of Congress, capitulated to government

8   demands that they demonetize and remove from YouTube the type of viewpoints that Daniels

9   advocates.  Although this action is brought in Daniels' individual capacity, it seeks to vindicate

10  free speech rights that protect all Americans who post controversial social-media content and

11  who suffer the consequences demanded by the government.  Defendants misapply the standard

12  applicable to an MTD in cases where a "novel" theory of liability is advanced and the law is

13  unsettled.  Pursuant to the Supreme Court's decision in <u>Blum v. Yaretsky</u>, 457 U.S. 991 (1982),

14  if a private actor is substantially encouraged or coerced by influential government officials,

15  then there is a nexus between the private actor and the government sufficient to trigger

16  constitutional safeguards.  Although Defendants cite numerous cases where social media

17  platforms have escaped First Amendment liability, they do not cite a single case applying the

18  "substantial encouragement" or "coercion" theory of state action, which turns on showing

19  either a nexus with government action or joint action.  Daniels has alleged specific conduct by

20  the government employed to encourage and coerce Defendants into removing and

21  demonetizing his content.  Daniels has also alleged that YouTube's CEO has publicly

22  acknowledged her company's capitulation to those demands, which were made on official

23  congressional letterhead.  If Daniels' theory is "novel"—as Defendants themselves admit—

24  then the MTD must be denied.

---

[1]   This lawsuit should be considered a civil rights action under <u>Bivens v. Six Unknown Fed.</u>
<u>Narcotics Agents</u>, 403 U.S. 388 (1971), not under Section 1983, because the government actors
here are federal officials.  It was brought directly under the United States Constitution, as is
required for a <u>Bivens</u> action.  (Compl. ¶ 2.)

**OPPOSITION TO MOTION TO DISMISS**

1

**II.    STANDARD**

2        When ruling on a 12(b)(6) motion, the Court must construe the complaint in the light

3   most favorable to the plaintiff.  <u>Parks Sch. of Bus. Inc. v. Symington</u>, 51 F.3d 1480, 1484 (9th

4   Cir.1995).  Accepting as true the complaint's material allegations, any inferences or

5   ambiguities are resolved in the plaintiff's favor.  <u>OSU Student Alliance v. Ray</u>, 699 F.3d 1052,

6   1061 (9th Cir. 2012); <u>Shwarz v. United States</u>, 234 F.3d 428, 435 (9th Cir. 2000).  Rule 12(b)(6)

7   motions are "viewed with disfavor and rarely granted."  <u>Broam v. Bogan</u>, 320 F.3d 1023, 1028

8   (9th Cir. 2003) (dismissal with prejudice proper only in "extraordinary cases"); <u>Gilligan v.</u>

9   <u>Jamco Dev. Corp.</u>, 108 F.3d 246, 249 (9th Cir. 1997).  Such motions are "especially

10  disfavored" where the complaint sets forth a novel legal theory "that can be best assessed after

11  factual development."  <u>McGary v. City of Portland</u>, 386 F.3d 1259, 1270 (9th Cir. 2004).

12       Defendants have attached several documents to their MTD that are not part of the

13  Complaint.  Such documents may be considered on a 12(b)(6) motion if the complaint refers to

14  them, if they are central to the plaintiff's claim and if no party questions their authenticity.

15  <u>United States v. Corinthian Colleges</u>, 655 F.3d 984, 999 (9th Cir. 2011).  Where the complaint

16  merely alleges a "contract"—not a specific document—the court may not consider documents

17  that are not indisputably the basis for the contract without converting the motion to one for

18  summary judgment.  <u>Ecological Rights Fdn. v. Pacific Gas & Elec. Co.</u>, 713 F3d 502, 511 (9th

19  Cir. 2013) (attached document must be central to claim).  Similarly, a complaint's "mere

20  mention of the existence of a document is insufficient to incorporate the contents of a

21  document."  <u>Coto Settlement v. Eisenberg</u>, 593 F.3d 1031, 1038 (9th Cir. 2010).

22  **III.   <u>THE COMPLAINT PROPERLY ALLEGES GOVERNMENT COERCION AND</u>**

23  **<u>ENCOURAGEMENT SUCH THAT THE FIRST AMENDMENT'S</u>**

24  **<u>CONSTITUTIONAL SAFEGUARDS APPLY TO DANIELS' SPEECH</u>**

25       **A.    <u>None of the Cases Defendants Cite Address the Theory of Governmental</u>**

26       **<u>Encouragement and Coercion of Social Media Censorship Practices</u>**

27       Defendants recount their long litigation history where First Amendment claims against

28  them (or similar platforms) failed for want of an element of government action.  For example,

Defendants cite <u>Manhattan Cmty. Access Corp. v. Halleck</u>, 139 S.Ct. 1921, 1930 (2019) (<u>cited in</u> Opening Br. at 2:19), which held that a public access channel was not a state actor because "merely hosting speech by others is not a traditional public function and does not alone transform private entities into state actors subject to First Amendment constraints." <u>See also</u> <u>Prager University v. Google, LLC</u>, 951 F.3d 991, 997-99 (9ᵗʰ Cir. 2020) (following <u>Halleck</u> in censorship challenge against YouTube) (<u>cited in</u> Opening Br. at 2:22). Finally, Defendants cite <u>Freedom Watch, Inc. v. Google, Inc.</u>, 368 F.Supp.3d 30 (D.D.C. 2019) (<u>cited in</u> Opening Br. at 2:7-3:1), where the district court rejected antitrust and First Amendment claims based on alleged coordination between social media platforms and news outlets because "Plaintiffs do not show how the Platforms' alleged conduct may fairly be treated as actions taken by the government itself" solely because the platforms were regulated by the government. <u>Id.</u> at 40.

Unfortunately for Defendants, none of those cases are on point: The facts and theories in Daniels' Complaint are quite different than those addressed in <u>Halleck</u>, <u>Prager University</u>, and <u>Freedom Watch</u>. Daniels' theory—that House Speaker Nancy Pelosi and Intelligence Committee Chairman Adam Schiff coerced, substantially encouraged, and threatened Defendants to remove and downgrade or demonetize the type of speech that Daniels expresses—is novel.[2] When a plaintiff advances a novel but plausible theory of liability, an MTD may not be granted:

> [T]he fact that McGary's claim does not fall within the four corners of our prior case law does not justify dismissal under Rule 12(b)(6). On the contrary, Rule 12(b)(6) dismissals "are especially disfavored in cases where the complaint sets forth a novel legal theory that can best be assessed after factual development." <u>Baker v. Cuomo</u>, 58 F.3d 814, 818-19 (2d Cir.), <u>cert. denied sub nom.</u>, <u>Pataki v. Baker</u>, 516 U.S. 980, 116 S.Ct. 488, 133 L.Ed.2d 415 (1995), <u>vacated in part on other grounds</u>, 85 F.3d 919 (2d Cir.1996) (en banc). As we have previously observed, "'[t]he court should be especially reluctant to dismiss on the basis of the pleadings when the asserted theory of liability is novel or extreme, since it is important that new legal theories be explored and assayed in the light of actual facts rather than a pleader's suppositions.'" <u>Elec. Constr. & Maint. Co., Inc. v. Maeda Pac. Corp.</u>, 764 F.2d 619, 623 (9th Cir.1985) (quoting 5 C. Wright & A. Miller, Fᴇᴅᴇʀᴀʟ Pʀᴀᴄᴛɪᴄᴇ ᴀɴᴅ Pʀᴏᴄᴇᴅᴜʀᴇ: Cɪᴠɪʟ § 1357, at 601-03 (1969)).

<u>McGary v. City of Portland</u>, 386 F.3d at 1270.

---

[2]    Defendants admit as much: "Plaintiffs tried to evade this precedent [citing to other cases in which the defendants were not deemed state actors] by advancing *a novel theory of state action.*" (Opening Br. at 7:3-4.)

**OPPOSITION TO MOTION TO DISMISS**

**B.**     **Under _Blum v. Yaretsky_ and Its Progeny, Defendants' Censorship Practices Constitute State Action Under Either the Governmental Nexus Test or the Joint Action Test**

An independent examination of the Supreme Court's opinion in <u>Blum v. Yaretsky</u> and its progeny leaves no doubt that the MTD must be denied.  <u>Blum</u> held that "a State normally can be held responsible for a private decision only when it has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State."  457 U.S. at 1004.  Over the years, the Ninth Circuit has interpreted <u>Blum</u> as encompassing four theories of state action by a private actor, any one of which is alone sufficient:  the public function test, the state compulsion test, the governmental nexus test, and the joint action test.  <u>George v. Pacific-CSC Work Furlough</u>, 91 F.3d 1227, 1230 (9th Cir. 1996).

Here, Daniels alleges that Defendants' censorship practice satisfies either the **governmental nexus test** or **the joint action test**.  Under the **governmental nexus test**, a private entity acts under color of state law if "there is a sufficiently close nexus between the State [and] the entity such that the latter may fairly be treated as that of the state itself."  <u>Blum</u>, 457 U.S. at 1004.  Under the **joint action test**, a private entity acts under color of state law if it is "a willful participant in joint action with the state or its agents" to the point that the state and the private entity are interdependent, as typically demonstrated through a substantial degree of cooperation involving sustained, joint efforts.  <u>Collins v. Womancare</u>, 878 F.2d 1145, 1154 (9th Cir. 1989) (reversing summary judgment because "there is no question that state actors were involved in the challenged conduct; the only question is whether [the private party] acted as 'a willful participant in joint activity'"); <u>United States v. Price</u>, 383 U.S. 787, 794 (1966) (holding that private defendants could be liable for constitutional violations: "it is enough that he is a willful participant in joint activity with the State or its agents").

Defendants claim that <u>Manhattan Cmty. Access Corp. v. Halleck</u>, 139 S.Ct. at 1928 (2019), eviscerated <u>Blum</u>'s holding that encouragement and coercion can demonstrate the existence of state action and that a "state action" finding now requires the government's actual

**OPPOSITION TO MOTION TO DISMISS**

"compulsion" of a private party.  Not so.  Halleck expressly addressed only the "public function" theory of state action:

> Under this Court's cases, a private entity can qualify as a state actor in a few limited circumstances—including, for example, (i) when the private entity performs a traditional, exclusive public function, *see, e.g., Jackson*, 419 U.S. at 352-354; (ii) when the government compels the private entity to take a particular action, *see, e.g., Blum v. Yaretsky*, 457 U.S. 991, 1004-1005; or (iii) when the government acts jointly with the private entity, *see, e.g., Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 941-942 (1982).
>
> The producers' primary argument here falls into the first category: **The producers contend that MNN exercises a traditional, exclusive public function** when it operates the public access channels on Time Warner's cable system in Manhattan.

*Id.* (emphasis added).  The stray comments Defendants cherry-pick from Halleck cannot be read as modifying, much less overruling, constitutional doctrines the Court did not claim to address. Blum and Lugar v. Edmondson Oil Co. are still binding authority.

The Ninth Circuit recognized this in Heineke v. Santa Clara University, 953 F.3d 1009 (9th Cir. 2020), post-Halleck, when it held that the presumption that private conduct does not constitute state action "may be overcome in limited circumstances, such as where the state 'has exercised coercive power or has provided such significant encouragement' that the challenged action must be considered that of the state."  *Id.* at 1012 (quoting Blum, 457 U.S. at 1004).  In addition, numerous courts have held that a private party can be held to answer for constitutional violations when it is a "willful participant" in a state action.  See, e.g., Collins, 878 F.2d at 1154 (reversing summary judgment because "there is no question that state actors were involved in the challenged conduct; the only question is whether [the private party] acted as a willful participant in joint activity"); Brunette v. Humane Soc'y of Ventura Cty., 294 F.3d 1205, 1211 (9th Cir. 2002) ("To be engaged in joint action, a private party must be a 'willful participant' with the State or its agents in an activity which deprives others of constitutional rights") (cited in Williams v. Albertsons Cos., No. 19-16420 (9th Cir. Aug. 5, 2020) (mem.)).

After failing to acknowledge the proper standard and vastly overstating the significance of Halleck, Defendants go on to misread the complaint by arguing that Daniels failed to allege that Defendants were coerced by the government.  This is simply wrong:  Speaker Pelosi and

**OPPOSITION TO MOTION TO DISMISS**

Chairman Schiff's encouragement, coercion, and threats are described in detail in and attached to the Complaint. (Compl. ¶¶ 20-24 & Exs. A & B.) Significantly, the Complaint includes an explanation of the coercive power of the government officials' use of official congressional stationery to send their messages. (Id. ¶ 25.) Plaintiff also shows that Pelosi and Schiff's coercion and encouragement *was so significant that Defendants actually capitulated:* YouTube CEO Susan Wojcicki, *in direct response* to Chairman Schiff's letter, acknowledged that "@YouTube" and Schiff were in a "partnership" and pledged that Defendants would "continue to consult with Members of Congress" on Schiff's content-moderation demands. (Id. ¶ 26 & Ex. C.) Finally, the time sequence alleged in the Complaint shows that Daniels' content was censored shortly after Schiff and Pelosi exerted their influence. (Compl. ¶¶ 6 (started on YouTube in 2015), 9 (live-streamed Fauci criticism on April 21, 2020), 10 (live-streamed George Floyd video), 20 & Ex. A (Schiff 2019 letter); 21 & Ex. B (Schiff 2020 letter), 24 (Pelosi threat: "you will be held accountable").)

Defendants claim to have acted on their own; they argue that no law, regulation or official action *compelled* YouTube to censor Daniels, and that that public statements by two of the most powerful Members of Congress are insufficient to create state action.[3] (Opening Br. at 8:7-9:14.) But Defendants fail to acknowledge the variety of ways in which influential Members of Congress may exert enormous pressure on an industry even without actually passing a law. See, e.g., Trump v. Mazars USA, LLP, 591 U.S. __, 140 S.Ct. 2019, 2032 (2020) (congressional committees have the power to issue subpoenas); Eastland v. United States, 421 U.S. 491, 504 n.15 (1975) (Congress's power of inquiry is "as penetrating and far-reaching as the potential power to enact and appropriate under the Constitution"); United States v. Biaggi, 853 F.2d 89 (2d Cir. 1988) (affirming conviction of Congressman who sent letters on

---

[3]   To avoid delay, Plaintiff's counsel repeatedly offered to meet and confer prior to the filing of an MTD. Defense counsel asserted that a meet and confer was not required and only reluctantly participated the day before the filing deadline. As a result, it was quite difficult to educate defense counsel about the results of Plaintiff's pre-filing research and analysis. (Armenta Decl. ¶ 4 & Ex. 3.) During the last-minute meet and confer session, defense counsel provided no legal authority for their position other than Section 230 of the CDA. A robust, proper and early conference between counsel on the points raised in the MTD could have vitiated the need for the MTD or resulted in minor amendments to the Complaint.

congressional and committee stationery to improperly influence third parties).  No industry leaders will lightly brush off the possibility that Congress can hold televised hearings where they will be asked probing or embarrassing questions, or pass legislation injurious to their business—such as repealing Section 230 of the of the Communications Decency Act, on which Defendants rely so heavily in this and every other case brought against them for the past two decades.  Far better to knuckle under to the Speaker's threat that "you will be held accountable" and graciously accept Chairman Schiff's "partnership" by promising to censor views with which those powerful individuals disagree.

C.   **Defendants, in "Partnership" with the Government, Have Engaged in Viewpoint Discrimination Against Plaintiff**

Defendants next argue that because Speaker Pelosi and Chairman Schiff did not identify Daniels by name, there is no nexus between their statements and Defendants' decision to censor Daniels.  Would Defendants then agree that if a powerful Congressman demanded that YouTube ban all African-American content creators, a failure to identify such creators by name would mean that there was no nexus between the officials' demand and the platform's racist responsive actions?  Defendants' argument reveals a profound misunderstanding of the constitutional prohibition of viewpoint and content discrimination, the strict scrutiny applied to such conduct, and the nexus or willful participation tests for state action.

The Supreme Court has often held that the First Amendment's core principle is that the government cannot discriminate against speech based on its content.  In Police Department of Chicago v. Mosley, 408 U.S. 92, 95 (1972), the Court held:  "[A]bove all else, the First Amendment means the government has no power to restrict expression because of its message, its ideas, its subject matter or its content."  Content-based restrictions on speech are prohibited unless the government (or in this case, the Defendants) can show that the regulation or policy is necessary to achieve a compelling governmental interest.  Rosenberger v. Rectors and Visitors of the University of Virginia, 515 U.S. 819 (1995) (striking down viewpoint discrimination against student-run religious publication); see also Matal v Tam, 582 U.S. ___, 137 S.Ct. 1744 (2017) (while First Amendment guards against targeting specific subject matter, viewpoint

**OPPOSITION TO MOTION TO DISMISS**

discrimination is an "egregious form of content discrimination" that is "presumptively unconstitutional"); Barr v. American Assn. of Political Consultants, Inc., No. 19-631 at *29 (U.S. July 6, 2020) (striking down federal statute that favored "debt-collection speech over plaintiffs' political speech").

The conduct described in detail in the Complaint (if fairly characterized as state action in light of Blum and its progeny) constitutes the most egregious form of viewpoint discrimination.  Rules about speech must be viewpoint neutral:  speech cannot be regulated based on its message.  See, e.g., Texas v. Johnson, 491 U.S. 397 (1989) (invalidating Texas law prohibiting flag desecration); Boos v. Barry, 485 U.S. 312 (1988) (striking down law that banned display of signs criticizing a foreign government near its embassy).  The reason is that such restrictions "raise[] the specter that the Government may effectively drive certain ideas or viewpoints from the marketplace."  Simon & Schuster, Inc. v. Members of New York State Crime Victims Bd., 502 U.S. 105, 116 (1991).  "Laws of this sort pose the inherent risk that the Government seeks not to advance a legitimate regulatory goal, but to suppress unpopular ideas or misinformation or manipulate the public debate through coercion rather than persuasion."  Turner Broadcasting System, Inc. v. Federal Commun. Comm'n, 512 U.S. 622, 641 (1994).

Even if Speaker Pelosi and Chairman Schiff disagree with content created by commentators such as Daniels because they believe that it contains "misinformation" about vaccines or contradicts the WHO's stance on COVID, they are not permitted to regulate free speech on the topic or to coerce, threaten or substantially encourage the Defendants to do so for them.  (See, e.g., Compl. Ex. A ("users will continue to see and engage with harmful medical content on your platforms" and "the best protection is removing or downgrading harmful content before users engage with it" and "I urge you to adopt a similar practice for YouTube users").)  In light of the measures taken by various states in the hope of "flattening" the COVID "curve," this material addresses one of the most relevant scientific, political and civil liberties issues of the day.  Thus, it deserves the highest level of First Amendment protection.[4]

---

[4]      Defendants attach transcripts of Daniels' videos, highlighting what appears to be the language most offensive to them.  (See Opening Br. 11:1-7 (opinions about Dr. Fauci, opinions

1    Defendants do not even attempt to argue that Daniels' speech incites violence, is

2    obscene, or otherwise falls out of the purview of First Amendment protection.  Cf. Miller v.

3    California, 413 U.S. 15, 23-24 (1973) (obscenity); Brandenburg v. Ohio, 395 U.S. 444, 447-

4    448 (1969) (incitement); see also Cohen v. California, 403 U.S. 15 (1971) (jacket with words

5    "Fuck the Draft" on back is protected speech); Cruise-Gulyas v. Minard, 918 F.3d 494 (6th Cir.

6    2019) ("a citizen who raises her middle finger [to police] engages in speech protected by the

7    First Amendment); Luke Records v. Navarro, 960 F.2d 134 (11th Cir. 1992) (applying Miller

8    test to song "As Nasty as They Want to Be" and finding trial court could not determine that it

9    had "no serious artistic value" simply by listening to it).

10    As set forth in the Complaint, Daniels' censored content primarily addresses issues

11    related to COVID and the protests that erupted after the death of George Floyd:  It is scientific

12    and political speech protected by the First Amendment.  Accordingly, the key inquiry in this

13    case implicates a novel issue:  Are Daniels' factual allegations of coercion and substantial

14    encouragement by Speaker Pelosi and Chairman Schiff sufficient to make out a plausible claim

15    for government action under Blum and its progeny under the governmental nexus or joint

16    action test?  Defendants make a shopworn slippery-slope argument, claiming that under

17    Daniels' theory, a private business might then become a state actor any time a legislator quietly

18    suggests it should operate in a particular manner.  But, contrary to Defendants' contentions, the

19    Complaint does not allege a mere *suggestion*.  Rather, Chairman Schiff put his demand on

20    *congressional letterhead*, sent it to YouTube and Google, published it on his official

21    congressional Twitter account and website, and received a kowtowing response from Google's

22    CEO acknowledging her  "partnership" with Congress and pledging to "continue to consult

23    with Members of Congress."  Chairman Schiff's use of government letterhead to demand

24    viewpoint-specific or subject-matter censorship is much more intimidating than the whispered

25    suggestion of general business practices that Defendants describe:  Using congressional

26

27    about the aftermath of George Floyd's death, and opinions about former President Obama).)
      Many Americans may disagree vehemently with Daniels' opinions.  However, Plaintiff submits
28    that controversial speech is especially in need of constitutional protection.  After all, who is
      going to squelch speech that expresses *popular* views?

**OPPOSITION TO MOTION TO DISMISS**

letterhead as part of his campaign to pressure Defendants into censorship converts Chairman Schiff's acts into official coercion.  See, e.g., Biaggi, 853 F.2d at 98 (Congressman indicted for bribes engaged in "official acts" when he used his congressional stationery to exert influence); United States v. Fattah, 914 F.3d 112 (3d Cir. 2019) (affirming conviction for conspiracy to funnel public funds of Congressman who had made requests for monies on official congressional letterhead); United States v. Jefferson, 634 F. Supp. 2d 595 (E.D. Va. 2009) (resolving issue of whether indicted Congressman had conducted "official act" by, among other things, using congressional letterhead).  Schiff's use of his taxpayer-funded congressional letterhead and official congressional website to coerce Defendants (or in his words, to officially "urge" them) to censor speech he disfavored crosses the bright line between (actionable) "official acts" and (non-actionable) suggestions by someone who happens to be a Member of Congress.  Official letters from the Chairman of the House Permanent Select Committee on Intelligence of the United States House of Representatives (Compl. Exs. A & B) signifies that a matter is serious indeed.  CEO Wojcicki's instant tweet-back shows she took it that way.

## IV.   PLAINTIFF PROPERLY ALLEGES CONTRACT-BASED AND IMPLIED COVENANT CLAIMS

### A.   Even Under the TOS Proffered by Defendants, A Factual Inquiry is Required to Determine Whether YouTube Breached the Contract

In considering Daniels' contract and implied covenant claims against YouTube, it is important to note at the outset that YouTube changes its Terms of Service ("TOS") with great regularity.  Daniels alleges in his Fifth Claim for Relief (breach of contract) that YouTube breached the contract set forth in the TOS by failing to inform him when one of his videos was flagged, stricken or taken down, and when his use of YouTube's SuperChat function was abruptly demonetized.  (Compl. ¶ 85.)  In an attempted gotcha, YouTube points to Paragraph 10 of the Complaint as an admission that YouTube did inform Daniels.  (Opening Br. 12:13-16 (citing Compl. ¶¶ 9, 10).)  Daniels alleges that he did not know his content was removed because YouTube failed to inform him and that he "learned of the takedown from one of his subscribers."  (Compl. ¶ 9.)  The reasonable inference to be drawn in Plaintiff's favor is that it

**OPPOSITION TO MOTION TO DISMISS**

was not until a subscriber advised Daniels that he reached out to YouTube and learned of the removal. (Compl. ¶ 9.) The obvious interpretation of the TOS term by which YouTube promises to "notify you of the reason for our action" is that YouTube will make the notification when it takes action, not when a content creator hears through the grapevine that his content has been removed.

Daniels also alleges in his Fifth Claim for Relief that Defendants failed to provide an appeals process. (Compl. ¶ 85.) YouTube argues that it did provide an "appeals process." As alleged in the Complaint, however, the "appeals process" consisted of Daniels contacting Google, with Google Support unilaterally terminating the chat process by which the appeal is managed (Compl. ¶ 9) and then falsely promising to respond to Daniels "within a day." (Compl. ¶ 9.)

Defendants also breached their contract with Daniels by demonetizing his use of YouTube's SuperChat function. YouTube's only communication to content creators on the issue of demonetization is as follows: "We have updated this article to provide more transparency that YouTube disables monetization on channels that haven't uploaded a video or posted to the Community tab for 6 months or more." (White Decl. Ex. 13.) Exhibit 15 appears to be the only document that even mentions the SuperChat monetization function—and states only that it may disabled if the creator has been dormant for 6 months. That was not the case here: As set forth in the Complaint, Daniels has been a very active content creator on YouTube since 2015.

Defendants attach a series of TOS documents to the White Declaration without identifying the operative dates of those agreements. It is black-letter law that any ambiguity in the documents created and proffered by Defendants is resolved in Plaintiff's favor. International Audiotext Network, Inc. v. AT&T Co., 62 F.3d 69, 72 (2d Cir. 1995); Hearn v. R.J. Reynolds Tobacco Co., 279 F.Supp.2d 1096, 1102 (D. Az. 2003) (cited in In re CMR Mortg. Fund, LLC, 416 B.R. 720 (N.D. Cal. 2009)). The White Declaration suggests that the TOS versions she attaches are current, but she provides the Court with no information as to which of them was operative at the inception of the Daniels-YouTube relationship and which

**OPPOSITION TO MOTION TO DISMISS**

was operative when YouTube removed and demonetized Daniels' content.  (Armenta Decl. ¶ 2 & Exs. 1, 2.)  Significantly, the TOS in place when Daniels began his relationship with YouTube construed YouTube's power more broadly.  (Armenta Decl. Exs. 1 & 2.)  Defendants narrowed their own latitude, voluntarily agreeing to remove content only when they "reasonably believe" that it violates their TOS.

> **B.**     **Whether YouTube Breached its TOS by Censoring Plaintiff's Videos Calls for a Factual Inquiry into Whether YouTube Held a "Reasonable" Belief That Daniels Violated the TOS**

Even assuming that the disputed documents attached by the Defendants may properly be considered on an MTD, Defendants' argument on the breach of contract claim should still be rejected.  Defendants identify Exhibit 1 to the White Declaration as the operative TOS.  While it is true that many content-removal cases against YouTube have failed because courts have concluded that YouTube's TOS authorized removal and demonetization, the TOS identified by Defendants in this case do not provide that latitude.  (Compare Opening Brief at 13 (listing various cases where courts concluded breach of contract claims failed because the TOS authorized removal or demonetization) with White Decl. Ex. 1 (alleged operative TOS).[5])  The TOS document provided by Defendants includes two relevant paragraphs on the topic of removal,[6] one governing the removal of content by the creator (i.e., Daniels) and one governing the removal of content by YouTube.  (White Decl. Ex. 1; Armenta Decl. Ex. 2.)  The TOS paragraph governing removal by the content creator states clearly:  "You may remove your Content from the Service at any time."  (Id.)  This gives *Daniels* the right to remove his content at any time with no restrictions. By contrast, the TOS document drafted and submitted by Defendants severely limits *YouTube*'s power to remove content:

---

[5]     Although Daniels here responds to the arguments made by Defendants based on the TOS at Exhibit 1, he objects to the attachment and selection of the TOS and exclusion of the 2015 TOS operative at the time he began his YouTube relationship.

[6]     These two paragraphs are attached to the Armenta Declaration as Exhibit 2.

**OPPOSITION TO MOTION TO DISMISS**

> If we reasonably believe that any Content is in breach of this Agreement or may cause harm to YouTube, our users, or third parties, we may remove or take down that Content in our discretion.

Id.  Significantly, not a single case cited by Defendants for the proposition that YouTube enjoys unfettered discretion to remove content discusses this "reasonable belief" restriction on YouTube's ability to remove content.  In Mishiyev v. Alphabet, Inc., 444 F. Supp. 3d 1154 (N.D. Cal. 2020),[7] the trial court agreed that YouTube's TOS permitted removal due to repeated copyright claims based on the term stating that "YouTube does not permit copyright infringing activities … [and] will remove all Content if properly notified that such Content infringes…").  In Lewis v. Google, LLC, 2020 WL 2745253 (N.D. Cal. May 20, 2018), the court dismissed only a breach of implied covenant claim based on plaintiff's concession that "YouTube's terms and guidelines explicitly authorized YouTube to remove or demonetize content that violates its policies."  Here, Daniels makes no such concession and the TOS document proffered by the Defendants does not give YouTube unfettered discretion. Defendants point to Prager University v. Google LLC,[8] an unpublished state court trial decision that is not precedential and should not be cited pursuant to Local Rule 3-4(e) ("Unpublished Prager").[9]  Unpublished Prager did not involve a breach of contract claim, but the dismissal of a breach of implied covenant of good faith claim that was based on TOS stating that "YouTube reserves the right to remove Content without prior notice,"[10] a term not contained in the TOS

---

[7]    Mishiyev is cited by Defendants as 2020 U.S. Dist. LEXIS 44723, at *9-12; the case has been published in the official reporter.

[8]    Cited as Prager University v. Google LLC, 2019 Super. LEXIS at *31-32 (Cal. Super. Ct. Nov. 19, 2019), attached for reference only to the Armenta Declaration, Ex. 4

[9]    N.D. Loc. Rule 3-4(e): "Any order or opinion that is designated: "NOT FOR CITATION," pursuant to [N.D. Cal.] Civil L.R. 7-14 or pursuant to a similar rule of any other issuing court, may not be cited to this Court, either in written submissions or oral argument, except when relevant under the doctrines of law of the case, res judicata or collateral estoppel." See also Cal. R. Ct. 8.1105(b) (any decision not certified for publication must not be cited or relied on by a party in any other action). Notably, the TOS on which the Unpublished Prager dismissal relied appears to be a prior iteration of YouTube's TOS.  (See Armenta Decl. Ex. 4 (attaching Unpublished Prager).)

[10]    "Remove Content without prior notice" language does appear where removal is based on a claim of copyright infringement. (White Decl. Ex. 3 at § 4 ¶ 7) (discussing copyright

**OPPOSITION TO MOTION TO DISMISS**

proffered by the Defendants in this case.  (<u>Compare</u> Armenta Decl. Ex. 4 (<u>Unpublished Prager</u>) <u>with</u> White Decl. Ex. 1 ("TOS") and Armenta Decl. Ex. 2 ("2015 TOS").)

Under California law, all ambiguities contained in the TOS are resolved against the drafters, "a rule that 'applies with peculiar force in the case of a contract of adhesion' such as this." <u>Lamps Plus, Inc. v. Varela</u>, ___ U.S. ___, 139 S.Ct. 1407, 1413 (2019).  The key issue arising out of the operative TOS proffered by the Defendants is whether their removal of Daniels' content is authorized by the provision requiring that YouTube "reasonably believe[]" that the "Content [was] in breach of this Agreement or may cause harm to YouTube, our users, or third parties."  (White Decl. Ex. 1.)  Because Plaintiff has alleged that YouTube breached the contract by removing his content without a contractual justification and in violation of his First Amendment rights, it is *Defendants*' factual burden to show that it held a reasonable belief that Daniels' content was in breach of the TOS or "may cause harm to YouTube, [its] users, or third parties."

In determining whether "reasonable belief" may be adjudged at the MTD stage, consider <u>Schulken v. Washington Mut. Bank, Henderson NV</u>, 2011 WL 4804063 (N.D. Cal. Oct. 11, 2011).  There, Schulken complained that a bank had cancelled its Home Equity Line of Credit ("HELOC").  The bank moved to dismiss, pointing to a provision authorizing it to cancel a HELOC under "Regulation Z."  <u>Id.</u> at *9.  But, as Judge Koh noted, Regulation Z permitted such cancellation only where the creditor had a "reasonable belief that the consumer will be unable to repay the debt due to a material change in circumstances."  <u>Id.</u> (citations omitted).  Judge Koh held that the plaintiff had sufficiently stated a breach of contract claim, and it was a question of fact to be proved by the parties what information the bank had to support its supposed "reasonable belief."  <u>Id.</u>  Similarly, whether YouTube held a "reasonable belief" about Daniels' content calls for a factual inquiry.  If, for instance, Defendants did not have a reasonable belief that Daniels breached the TOS or that his content would harm others, and they were merely acceding to governmental censorship demands, then Daniels would

---

infringement removals).  So, Defendants and their army of lawyers do know how to say it when they mean it.

**OPPOSITION TO MOTION TO DISMISS**

prevail under the terms of the TOS proffered by the Defendants.  In stating that YouTube breached the contract by removing and demonetizing his content without any "compelling, significant or legitimate reason" (Compl. ¶ 60), Daniels has sufficiently stated a breach of contract claim against YouTube for the improper and unjustified removal of his content in direct violation of the TOS Defendants themselves proffered.  This is not a matter that can be decided at the pleading stage, particularly where Daniels alleged the removals were without justification and done in bad faith.  (Compl. ¶¶ 59, 60.)

C.   **YouTube is not Entitled to Deny Daniels the Benefit of the Contracts/Agreements, and Daniels Properly Alleged That Defendants Breached the Implied Covenant by Interfering with His Receipt of Benefits in Bad Faith**

"Every contract imposes on each party a duty of good faith and fair dealing in each performance and in its enforcement." Enhanced Athlete, Inc. v. Google, LLC, 2020 WL 4732209 (N.D. Cal. Aug. 14, 2020) (citing California law).  "The implied covenant supplements the express contractual covenants, to prevent a contracting party from engaging in conduct which (while not technically transgressing the express covenants) frustrates the other party's rights to the benefits of the contract." Id.  In Enhanced Athlete, Google made the same argument it makes here, and Judge Gillam granted an MTD on the plaintiff's implied covenant claim for the following reasons:  (1) plaintiff did not identify ambiguities in the documents; (2) the court incorporated the documents proffered by Google without objection from the plaintiff; and (3) the proffered TOS gave Google "sole discretion" to discontinue the service at any time. Id. *6.  By contrast, Daniels has (1) identified ambiguities in the documents that must be resolved against Defendants as the drafter of those documents; and (2) explained that the TOS proffered by the Court do not give Defendants the "sole discretion" to remove Daniels' content—instead, YouTube's removal right is constrained by the requirement that it "reasonably believed" Daniel's content violated the Agreement and Community Guidelines. Defendants cannot make such a showing on an MTD because "reasonable belief" is necessarily a factual inquiry.  Accordingly, the breach of implied covenant claim must stand.

**OPPOSITION TO MOTION TO DISMISS**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## V.   PLAINTIFF'S COMMON LAW CLAIMS ARE PROPERLY PLEADED

### A.   The Claim for Conversion Requires Only Facts Adequate to Identify the Sum Taken by the Defendants

Daniels' conversion claim is grounded on Defendants' improper retention of donations made to him by his fans through YouTube's SuperChat function.  The Third Claim for Relief for Conversion clearly lays out the elements of this cause of action as follows:  (1) Daniels had a right to the donations made by his fans and followers; (2) YouTube intentionally withheld and retained that property; (3) Daniels did not consent to give YouTube his property; and (4) YouTube's conduct was a substantial factor in causing Daniels' economic harm.  (Compl. ¶¶ 73-77.)  YouTube asks this Court to dismiss the claim for conversion because Daniels has also alleged the existence of a contract between him and YouTube.  (Opening Br. at 15:22-16:14.)  However, YouTube also argues that "the Complaint does not identify those agreements or seek to premise a contract claim on them."  (Id. at 14:5-6.)  Defendants then cite cases for the proposition that where a contract identifies the rights of the parties, an equitable claim such as conversion may be dismissed.  (Id. at 15:15-20 (citing Haskins v. Symantec Corp., 2013 WL 623610 (N.D. Cal. Dec. 2, 2013)).)  Defendants ignore the district court's warning that Haskins must be "distinguishe[d] from Supervalu, in which money had and received remained viable as a quasi-contractual remedy for harms which occurred distinct from the parties' agreement."  Id. at *11 (citing Supervalu, Inc. v. Wexford Underwriting Managers, Inc., 175 Cal.App.4th 64, 78 (2009)).  Because YouTube failed to identify any contract that governs the revenue-share for the SuperChat function, its contract argument is inapposite.[11]

Defendants' argument that the conversion claim fails because Daniels cannot identify the specific amounts of money YouTube withheld from his donations is misleading.  As Daniels' counsel clearly indicated during the pre-filing meet and confer, once YouTube deleted the videos, the analytics related to the sums donated disappeared from Daniels' reach on the platform. (Armenta Decl. ¶ 4 & Ex. 3). For that reason, discovery is necessary to enable

---

[11]   Daniels opposes the MTD as to the Fourth Claim for Relief on the same grounds.

**OPPOSITION TO MOTION TO DISMISS**

Daniels to determine the exact amount at issue in his conversion claim.  But, at the pleading

stage, a plaintiff must allege only an amount "capable of identification."  <u>PCO, Inc. v.</u>

<u>Christensen, Miller, Fink, Jacobs, Glaser, Weil & Shapiro</u>, 150 Cal.App.4th 384 (2007) (cited in

<u>Natomas Garden Inv. Group v. Sinadinos</u>, 710 F.Supp.2d 1008 (E.D. Cal. 2010)).  Considering

the liberal pleadings requirements in federal court, it is only necessary for plaintiffs to allege an

amount of money that is 'capable of identification.'"  <u>Id.</u> at 1019.  Daniels has met that

standard:  He alleged that the conversion claim covers funds that his supporters donated

through the YouTube SuperChat platform but that he never received because YouTube

removed his videos and pocketed the money.  (Compl. ¶¶ 72-42.)  Because the amount of

money at issue is known only to the Defendants, this Court should reject their argument that the

claim fails for want of an allegation of a specific sum.

## B.     This Circuit Recognizes Unjust Enrichment as an Independent Claim

Daniels has also stated an unjust enrichment claim against Defendants based on their

wrongful retention of his donations.  Despite attaching numerous agreements to the MTD,

Defendants have not pointed to any specific contract term that governs what happens when

YouTube collects money for a creator and then refuses to hand it over, as the consumers and

fans anticipated.  (<u>Compare</u> <u>generally</u> White Decl. Ex. 15 (webpage governing SuperChat

stating that "SuperChat and SuperStickers are ways to monetize your channel through the

YouTube Partner Program" and "You can see revenue reports") <u>with</u> Compl. 13 ("Daniels' fans

and followers have donated to him through the YouTube platform's SuperChat function … his

subscribers have donated monies earmarked for him but YouTube has retained those monies").)

A search of the agreements proffered by Defendants failed to identify a provision giving

YouTube the right to take the money that subscribers direct to creators through the SuperChat

function, other than the inducement that SuperChat is a "way[] to monetize your channel."

(<u>See generally</u> White Decl. Ex. 15.)  The MTD identifies none.

Citing two California cases, Defendants move to dismiss the unjust enrichment claim on

the sole ground that it does not constitute a cause of action.  (Opening Br. at 16:15-17 (citing

<u>Durell v. Sharp Healthcare</u>, 183 Cal.App. 4th 1350, 1370 (2010) and <u>Melchior v. New Line</u>

**OPPOSITION TO MOTION TO DISMISS**

<u>Prod., Inc.</u>, 106 Cal.App.4th 779, 793 (2003)).)  While this is the approach *some* California courts have taken, it is not the approach taken by the courts of the Ninth Circuit:  "The California Supreme Court has clarified California law and allowed independent claims for unjust enrichment to proceed."  <u>Bruton v. Gerber Prod. Co.</u>, 703 Fed.Appx. 468, 470 (9th Cir. 2017) (citing <u>Hartford Cas. Ins. Co. v. J.R. Mktg.</u>, 61 Cal.4th 988, 1000 (2015)); <u>see also</u> <u>Adana Jiagbogu v. Bank of America</u>, 2016 WL 7626249 (C.D. Cal. Dec. 1. 2016) (declining to follow both <u>Durell</u> and <u>Melchior</u> and noting that "this Court has generally taken the approach that the claim should survive that argument").

> **C.**      **To Avoid Another Round of Delay, Plaintiff Will Consent to Voluntary Dismissal Without Prejudice of his Fraud and Wire Fraud Claims, but the UCL Claim is Not Predicated on Fraud and Plaintiff Will Not Dismiss It**

Given that Daniels' important First Amendment rights are implicated in this case, and to avoid a delay requiring more particularized pleading of his Eighth Claim for Relief for Fraud in the Inducement and The Ninth Claim for Relief for Wire Fraud, he consents to the dismissal of that claim *without prejudice* to bringing a motion for leave to restore those claims once further discovery and investigation is completed.  However, Daniels opposes the MTD as to the claim for violation of Section 17200 because prosecution of the Section 17200 claim may well vindicate an important public interest that is relevant to many others similarly situated to Daniels.  The UCL claim will necessarily rise or fall with Daniels' claims that Defendants violated his First Amendment rights, making their conduct *unlawful*, and that Defendants unlawfully appropriated Daniels' earmarked donations, making their conduct an *unfair* business practice.<sup>12</sup>  Unlawful business activity includes "anything that can properly be called a business practice and at the same time is forbidden by law." <u>Farmers Ins. Exch. v. Superior Court</u>, 2 Cal.4th 377, 383 (1992).  If YouTube, at the behest of government officials, censored Daniels' speech and had no "reasonable belief" under the TOS as is required, then the activity is unlawful.  "Unfair" simply means any practice whose harm outweighs its benefits.  <u>Olsen v.</u>

---

<sup>12</sup>      Contrary to Defendants' assertion in the MTD (Opening Br. 16:19-20), Daniels did *not* allege "fraudulent" business practices in his UCL claim.  (<u>See</u> Compl. ¶¶ 97, 98.)

**OPPOSITION TO MOTION TO DISMISS**

Breeze, Inc., 48 Cal.App.4th 608, 618 (1996).  If Daniels can prove that the harm he suffered

from the violation of his First Amendment rights and the conversion of his funds outweighs the

"benefit" to YouTube, then the unfairness prong is met.  The allegations made by Daniels in the

Complaint more than suffice to support a claim under Section 17200.

**VI.    SECTION 230 DOES NOT BAR PLAINTIFF'S CLAIMS**

Unsurprisingly, Defendants rely on Section 230 of the Communications Decency Act

("CDA") for the proposition that Daniels has no right to challenge their content censorship and

demonetization.  Defendants' argument—essentially, that they are above the law—is wrong.

Historically, the CDA was designed to "to promote the free exchange of information and ideas

over the internet and to encourage voluntary monitoring for offensive or obscene material."

Batzel v. Smith, 333 F.3d 1018 (9th Cir. 2003).  The statute provides immunity for "'Good

Samaritan' blocking of offensive material."  47 U.S.C. § 120(c).  Specifically, civil liability

immunity is provided for "[a]ny action voluntarily taken *in good faith to restrict access or*

*availability of material that the provide or user* considers to be *obscene, lewd, lascivious, filthy,*

*excessively violent, harassing, or otherwise objectionable,* whether or not such material is

constitutionally protected."  42 U.S.C. § 230 (emphasis added).  Section (c)(1) of the CDA

protects an ISP from being "treated as the publisher or speaker of any information provided by

another information content provider."  42 U.S.C. §230(c)(1).  In other words, according to one

view, "lawsuits seeking to hold a service provider liable for its exercise of a publisher's

traditional editorial functions—such as deciding whether to publish, withdraw, postpone or

alter content—are barred."  Zeran v. America Online, 129 F.3d 327 (4th Cir. 1997).  But see

Chicago Lawyers' Comm. For Civil Rights Under Law, Inc. v. Craigslist, Inc., 519 F.3d 666

(7th Cir 2008), as amended (May 2, 2008) (rejecting the view that subsection (c)(1) creates

"immunity").

Contrary to Defendants' position and the citations they provide, whatever immunity

Section 230 of the CDA provides is *not* boundless.  See, e.g., Song Fi. Inc. v. Google, 108

F.Supp.3d 876 (N.D. Cal. 2015) ("[T]he Court declines to adopt YouTube's completely

subjective (and entirely unbounded) reading of these provisions"); Sherman v. Yahoo!, Inc.,

997 F.Supp.2d 1129, 1138 (S.D. Cal. 2014) ("The Court declines to broadly interpret 'otherwise objectionable' material to include any or all information or content."). Just last December, the Ninth Circuit held that Section 230 does *not* immunize blocking and filtering decisions that are driven by anti-competitive animus. Enigma Software Group USA, LLC v. Malwarebytes, Inc., 946 F.3d 1040 (9th Cir. 2019, petition for cert. pending sub nom. Malwarebytes, Inc v. Enigma Software Group USA, LLC, No. 19-1284 (U.S. May 12, 2020). Enigma signals a retreat from the approach of some district courts that allowed companies like Defendants to enjoy virtually unfettered immunity for decisions to remove content from their platforms. Although district courts have varied in giving ISPs relatively unlimited leeway to block content, the Ninth Circuit has now indicated that this leeway has bounds: "What is clear to us from the statutory language, history, and case law is that providers do not have unfettered discretion to declare online content 'objectionable' and blocking and filtering decisions that are driven by anticompetitive animus are not entitled to immunity under section 230(c)(2)." Enigma, 946 F.3d at 1047. The Ninth Circuit or the Supreme Court could very well conclude that ISPs also do not have unfettered discretion to violate the First Amendment rights of creators when those actions are designed, encouraged, and coerced by government officials.

Furthermore, Section 230 provides immunity to an ISP only when it acts in "good faith." The Ninth Circuit has held that "a decision that someone did or did not act in good faith is one where the determination is 'an essentially factual inquiry' …" In re Figter Limited, 118 F.3d 635, 638 (9th Cir. 1997). Moreover, the legal issues implicated by this case are not clear-cut. Given the Ninth Circuit's retreat from interpreting Section 230 as conferring total immunity, and given the statutory language and history of Section 230, the conclusion suggested by Defendants is incorrect. (Cf. Opening Br. 20:8-22:2 (citing only pre-Enigma cases, but not citing Song Fi or Sherman, *supra*.).) Enigma tore a large hole in Defendants' argument that Section 230 gives them total immunity. Since Enigma is now the law of the circuit, the MTD must be denied.

The statutory analysis in Enigma is also persuasive. The Ninth Circuit there construed the term "otherwise objectionable" in Section 230 as including only categories of materials that

**OPPOSITION TO MOTION TO DISMISS**

can "fairly be placed close" enough to the categories listed in Section 230 as authorizing

providers to act as they please.  Those categories include materials that are "obscene, lewd,

lascivious, filthy, excessively violent, [or] harassing."  Enigma held that spam, malware, and

adware were sufficiently similar to those categories to fall within the "otherwise objectionable"

category.  This is important because unlike Daniels' speech, spam, malware, and adware are

typically held in low regard because they harass users.  Daniels' content, on the other hand,

cannot be classified as "fairly close" to obscenity, harassment, and the like.[13]  Accordingly,

Defendants cannot rely on the "otherwise objectionable" portion of Section 230 to excuse their

unfettered censorship of Daniels and others like him.  See also Song Fi, Inc., 108 F.Supp.3d at

883 ("otherwise objectionable" provision of Section 230 does not extend so far as to make

operators of video-sharing website immune from liability for contract and tortious interference

claims related to decision to block plaintiff's music video based on purported breach of terms

of service, because Section 230's title specifically refers to "offensive content").[14]

Moreover, by highlighting only a few seemingly inflammatory and profane snippets of

Daniels' lengthy videos, Defendants transparently attempt to provoke this Court into ignoring

well-settled law and to conclude without any analysis that Daniels' speech may reasonably be

deemed "objectionable."  However, whether speech is objectionable, just as whether it is

obscene, is measured against the applicable state law and requires a determination that "taken

as a whole, [it] does not have serious literary, artistic, political or scientific value.  Miller v.

---

[13]    While Daniels occasionally uses the type of vulgar language that is common among rap music artists and other internet personalities, e.g. https://www.youtube.com/watch?v=Wc5IbN4xw70, he is clearly using that language in a figurative sense to emphasize his political message, not as a literal description or advocacy of obscene acts.  Outside of the public-school context, speech that is profane is protected.  United States v. Poocha, 259 F.3d 1077 (9th Cir. 2001) ("Fuck you" directed at a park ranger was not intended nor likely to incite a riot was protected because its natural import "was an expression of criticism of the police, not an incitement of the crowd to riot"  "as tasteless as it may have been, falls squarely within the protection of the First Amendment").

[14]    The Northern District of California recently held that the CDA's goal was to encourage platforms to "self-police" for the purpose of limiting children's access to offensive material. Gonzalez v. Google, Inc., 282 F.Supp.3d 1150 (N.D. Cal. 2017).

**OPPOSITION TO MOTION TO DISMISS**

1   California, 413 U.S. at 15; see also United States v. Merrill, 746 F.2d 458 (9th Cir. 1984)

2   (noting that the patently offensive test under the Miller standard is a "factual determination").

3   In summary, Enigma makes it clear that YouTube can no longer hide behind Section 230 and

4   its TOS when it has bad motives such as, in that case, anticompetitive animus.[15]  Can

5   Defendants really argue at the MTD stage that Daniels' speech "does not have serious literary,

6   artistic, political or scientific value"?

7       While Defendants' ostrich-like failure to appreciate the significance of the Ninth

8   Circuit's decision in Enigma is disconcerting, their failure to even acknowledge Judge

9   Gilliam's recent decision in Enhanced Athlete, Inc. v. Google, LLC, 2020 WL 4722209, cannot

10   be a mere oversight:  it was their case.  In Enhanced Athlete, just as in this case, Google moved

11   to dismiss the Complaint of a plaintiff who objected to Google's removal of his videos from

12   YouTube.  Id. *1.  Just like Daniels, the plaintiff in Enhanced Athlete is a YouTube content

13   creator who had published videos to YouTube, only to have them subsequently removed by

14   YouTube, which made opaque, boiler-plate remarks about how the videos violated YouTube's

15   Community Guidelines.  Id. (noting plaintiff asked YouTube to explain its actions only to be

16   met with vague responses that his viewpoints and opinions on health "promot[ed] violent or

17   dangerous acts that have an inherent risk of serious physical harm or death.")  Like Daniels (see

18   Compl. ¶ 59), the Enhanced Athlete plaintiff alleged that the defendants did not act in good

19   faith and therefore were not entitled to immunity when they struck videos that were allegedly in

20   full compliance with YouTube's Community Guidelines, that they failed to provide any

21   comprehensible explanations for what was objectionable about the videos, and that they were

22   striking videos that were not "advertiser-friendly" for their own financial benefit.  Id. *4.  (Cf.

23

24   [15]     Since the Ninth Circuit decided Enigma, only three cases have cited it.  See Asurvio LP
    v. Malwarebytes, Inc., 2020 WL 1478345 (N.D. Cal. Mar. 26, 2020) (holding that Asurvio and
25   Malwarebytes were not direct competitors so anti-competitive animus immunity limitation did
    not apply); Zekleman Indus. Inc. v. Marker, 2020 WL 1495210 (D. Az. Mar. 27, 2020) (cited for
26   proposition that not all claims under Lanham Act involved trademarks); Hepp v. Facebook, 2020
    WL 3034815 (E.D. Pa. June 5, 2020) (in right of publicity case against social media platforms
27   for hosting publication of a photograph, citing Enigma for proposition that immunity for
    intellectual property claims should be construed narrowly).  No case since Enigma has revisited
28   the issue of ISP immunity for blocking content when the decision to do so is based neither on
    good faith nor on a purely subjective decision the content is "objectionable."

1  Compl. ¶ 59 ("When Defendants took down Plaintiff's material, they were not acting in good

2  faith."); ¶ 54 ("YouTube applies its censorship criteria, including the Terms of Use and

3  Community Guidelines, as a pretext to censor and restrict Plaintiff's speech based on the

4  content of the speech … arbitrary and capricious and/or is based on political, religious, and

5  other animus towards the identity and viewpoints of the speaker…").)  Judge Gilliam ultimately

6  ruled[16] that the <u>Enhanced Athlete</u> plaintiff "has alleged sufficient facts to support its claim that

7  Defendants did not act in good faith" and therefore were not necessarily entitled to Section 230

8  immunity.  <u>Enhanced Athlete</u>, <u>supra</u>, *4.

> At this stage of the litigation, the Court must accept as true the Plaintiff's allegations in the complaint, and draw all inferences in the light most favorable to the Plaintiff.  As such, the Court finds that Plaintiff has alleged bad faith such that the Court cannot dismiss Plaintiff's breach of implied covenant claim on the basis of Section 230(c)(2) at this time.

<u>Id.</u>  At least one other district court reached the same conclusion when Google claimed Section 230(c)(2) immunity in the face of an allegation that it had not acted in sufficient good faith to trigger that immunity.  <u>See</u>, <u>e.g.</u>, <u>e-ventures Worldwide, LLC v. Google, Inc.</u>, 188 F.Supp.3d 1265 (M.D. Fla. 2016) (reconsideration denied, motion to certify appeal denied) (holding that the CDA's good-faith defense was not apparent on the face of plaintiff's complaint and could not be considered on a motion to dismiss where the plaintiff claimed that Google was not acting in good faith).

## VII.   DEFENDANTS' OWN FIRST AMENDMENT RIGHTS DO NOT BAR DANIELS' CLAIMS

Defendants claim that their own First Amendment rights as editors and publishers protect their decision to censor Daniels' content and erase it from their YouTube platform. Daniels does not dispute that, much like a newspaper, Defendants generally enjoy a First Amendment right to decide what to publish on their privately owned social media platform. Standing alone, YouTube may well have some First Amendment right to remove content it does not like, assuming that they can get past the Section 230 "good faith" limitation.

---

[16]   Judge Gilliam granted the MTD, but the plaintiff was afforded leave to amend his claim for breach of the implied covenant of fair dealing.

However, this case is different for several reasons.  First, Daniels has alleged that Defendants' actions in removing and demonetizing his content was not an exercise of their First Amendment rights but, rather, the result of influence, coercion, encouragement, and threats by government officials such as Speaker Pelosi and Chairman Schiff.  Second, if Daniels prevails on his argument that Defendants' censorship practices constitute "state action" (under either the "government nexus" or the "joint action" test set forth in <u>Blum</u>), their argument falls apart. When the state engages in viewpoint discrimination, the government cannot defend on the ground that it was merely exercising its own First Amendment rights, because the First Amendment is a right that the people enjoy *against* the state.[17]  Third, Defendants' First Amendment rights are irrelevant to Daniels' claims for conversion, breach of contract, breach of the implied covenant, or violation of Section 17200.

## VII.   <u>CONCLUSION</u>

Plaintiff Marshall Daniels respectfully requests that this Court DENY Defendants' Motion to Dismiss the Complaint, except with respect to the Eighth and Ninth claims for relief, which should be dismissed *without* prejudice.

Dated: September 3, 2020                 ARMENTA & SOL, PC


By:   */s M. Cris Armenta*
_____
                        M. Cris Armenta
                        Attorneys for Plaintiff
                        Marshall Daniels

---

[17]     For example, if a plaintiff sues a federal agency for engaging in viewpoint-discrimination censorship, the federal agency cannot defend the case on the ground that its censorship was merely the expression of its own First Amendment rights.  Similarly, if this Court finds that YouTube's partnership with the government raises its censorship practices to the level of state action, YouTube cannot use the First Amendment to shield its own bad actions.